**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION**

| | | |
|---|---|---|
| **ResMan, LLC,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **Civil Action No. 4:19-cv-00402-ALM** |
| | § | |
| **Karya Property Management, LLC,** | § | **JURY TRIAL** |
| **And Scarlet InfoTech, Inc. d/b/a** | § | |
| **Expedien, Inc.** | § | |
| | § | |
| **Defendants.** | § | |
| | § | |
| | § | |

## JOINT FINAL PRE-TRIAL ORDER

Pursuant to the Court's Scheduling Order (Dkt. 84), Plaintiff ResMan, LLC ("Plaintiff" or "ResMan") and Defendants Karya Property Management, LLC ("Karya") and Scarlet Infotech, Inc. d/b/a Expedien, Inc. ("Expedien") (collectively "Defendants," and together with ResMan, the "Parties") file this Joint Final Pretrial Order in advance of the Final Pretrial Conference scheduled for September 4, 2020.

## A. COUNSEL FOR THE PARTIES

**Counsel for Plaintiff:**

Maria Wyckoff Boyce, Lead Attorney
Texas SBN 22095050
maria.boyce@hoganlovells.com
Cristina Espinosa Rodriguez
Texas SBN 00793701
cristina.rodriguez@hoganlovells.com
Jillian C. Beck
Texas SBN 24082672
jillian.beck@hoganlovells.com
Ira Jamshidi
Texas SBN 24092574
ira.jamshidi@hoganlovells.com
S. Lee Whitesell
Texas SBN 24093356
lee.whitesell@hoganlovells.com
**HOGAN LOVELLS US LLP**

609 Main Street, Suite 4200
Houston, Texas 77002
T  (713) 632-1400
F  (713) 632-1401

Jessica L. Ellsworth (pro hac vice)
jessica.ellsworth@hoganlovells.com
**HOGAN LOVELLS US LLP**
555 Thirteenth Street, NW
Washington, DC 20004
T  (202) 637-5600
F  (202) 637-5910

Michael E. Jones
Texas SBN 10929400
**POTTER MINTON, P.C.**
110 North College, Ste. 500
Tyler, Texas 75702
T (903) 597-8311
F (903) 593-0846

Tommy Jacks
jacks@fr.com
Texas Bar No. 10452000
**FISH RICHARDSON P.C.**
111 Congress Avenue, Ste. 810
Austin, TX 78701
Tel: (512) 472-5070
Fax: (512) 320-8935

Daniel C. Winston (pro hac vice)
dwinston@choate.com
Greta A. Fails (pro hac vice)
gfails@choate.com
**CHOATE, HALL & STEWART LLP**
Two International Place
Boston, MA 02110
T (617) 248-5000
F (617) 248-4000

**<u>Counsel for Defendants:</u>**

Michael E. Richardson, Lead Attorney
State Bar No. 24002838
mrichardson@beckredden.com

Seepan V. Parseghian
State Bar No. 24099767
sparseghian@beckredden.com
**BECK REDDEN LLP**
1221 McKinney Street, Suite 4500
Houston, TX 77010
Telephone:  (713) 951-3700
Facsimile:  (713) 951-3720

Richard A. Sayles
State Bar No. 17697500
dsayles@bradley.com
Mark D. Strachan
State Bar No. 19351500
mstrachan@bradley.com
**BRADLEY ARANT BOULT CUMMINGS LLP**
4400 Renaissance Tower
1201 Elm Street
Dallas, Texas 75270
Telephone No. (214) 939-8700
Facsimile No. (214) 939-8787

## B.   STATEMENT OF JURISDICTION

This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, and original jurisdiction under the Computer Fraud and Abuse Act (CFAA), 18 U.S.C. § 1030, and the Federal Defend Trade Secrets Act (DTSA), 18 U.S.C. § 1836. This Court has supplemental jurisdiction over Plaintiff's state law claims because they arise out of the same transactions and occurrences and are within the same case or controversy pursuant to 28 U.S.C. § 1367.

Jurisdiction is not disputed.

## C.   NATURE OF ACTION

### _Plaintiff's Statement:_

This is an action for breach of contract, tortious interference with a contract, violation of the Computer Fraud and Abuse Act, declaratory judgment, and misappropriation of trade secrets.  The technology at issue is Property Management System ("PMS") software.

ResMan alleges that its former customer Karya breached its contractual obligations to ResMan by using ResMan's proprietary and confidential information for unauthorized purposes.

ResMan further alleges that Karya breached its contractual obligations to ResMan by providing Karya's third party software consultant, Expedien, with extensive unauthorized access to ResMan's proprietary and trade secret software platform for the express purpose of usurping and unfairly building upon ResMan's investments in the ResMan Platform.

ResMan further alleges that Karya misappropriated ResMan's trade secrets related to the ResMan Platform, in violation of federal and state statutes.

ResMan further alleges that Karya violated the Computer Fraud and Abuse Act by accessing ResMan's protected computer without authorization or by exceeding authorized access.

ResMan further alleges tortious interference against Expedien for, among other things, inducing Karya to breach its contractual obligations to ResMan.

ResMan further alleges that Expedien misappropriated ResMan's trade secrets related to the ResMan Platform, in violation of federal and state statutes.

ResMan further alleges that Expedien violated the Computer Fraud and Abuse Act by accessing ResMan's protected computer without authorization.

ResMan denies that it ever breached the MSA and further denies that its trade secrets are publicly available information or that they were not reasonably protected.

Against both Defendants, ResMan seeks actual damages, punitive damages, injunctive relief, declaratory relief, attorneys' fees, costs, and expenses.

### _Defendants' Statement:_

Defendants deny ResMan's allegations.  In particular, Karya denies that it breached the Master Services Agreement ("MSA") with ResMan and alleges that ResMan has failed to demonstrate both causation and damages related to a purported breach.  Karya further alleges that ResMan's claims of breach of contract are barred by ResMan's first material breach of the MSA.  Karya further denies that it misappropriated ResMan's alleged trade secrets related to the ResMan software, and alleges that ResMan's trade secrets claims fail because, among other things, ResMan has not identified trade secrets with sufficient particularity, it has not shown misappropriation, its alleged trade secrets are publicly available information, and ResMan has failed to take adequate measures to protect the secrecy of its alleged trade secrets.  Karya further contends that ResMan has failed to demonstrate both causation and damages.

Expedien denies that it tortiously interfered with the ResMan-Karya MSA, the terms of which it was unaware.  Expedien further denies that it misappropriated ResMan's alleged trade secrets and reiterates Karya's relevant allegations above.

Defendants deny violating the Computer Fraud and Abuse Act ("CFAA"), and further allege that, pursuant to the CFAA, ResMan has not shown "loss," that Defendants acted with wrongful intent, or that Defendants engaged in wrongful conduct.

Defendants further deny that ResMan is entitled to recover any damages or injunctive relief, and dispute the nature and extent of ResMan's claim for damages and injunctive relief.

## D.  CONTENTIONS OF THE PARTIES

The parties agree that by providing these contentions, no party is conceding the validity or truth of any other party's contentions or that all such contentions will be appropriate for determination by the factfinder.  In addition, no party waives any right to object to the admissibility of any evidence or to challenge the legal or factual sufficiency of any claim or defense.

### _Plaintiff's Contentions:_

#### a)  Factual Contentions

1. ResMan's primary product and service offering is the password-protected ResMan Platform (defined below), a property management software system for multifamily property managers, owners, and operators.

2. ResMan owns all Subscription Services, ResMan Technology, Deliverables, and Intellectual Property Rights therein (collectively, the "ResMan Platform"), as those terms are defined in ResMan's Master Subscription Agreement ("MSA").

3. ResMan owns all trade secrets and confidential or proprietary information related to the password-protected ResMan Platform.  This information has been and remains confidential and derives independent economic value from not being generally known to, or readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.

4. ResMan has not authorized the use or disclosure of its information except under the terms of confidentiality agreements, including the MSA.

5. The ResMan Platform is used in, and intended for use in, interstate commerce.

6. The password-protected ResMan Platform was built by ResMan employees who never accessed any competing property management software systems while developing the ResMan Platform.

7.  Since the first launch of a ResMan Platform version with limited functionality in late 2012/early 2013, the ResMan Platform has developed significantly and continues to be updated on a consistent and ongoing basis.

8.  ResMan has spent over $12 million from 2008 to mid-2019 just in labor costs for research and development to develop the password-protected ResMan Platform.

9.  ResMan has taken, and continues to take, reasonable measures to maintain the secrecy of its information contained on the password-protected ResMan Platform.

10.  ResMan employees and contractors all sign agreements requiring them to maintain the confidentiality of ResMan's information.

11.  ResMan requires employee badges for entrance into its facilities and maintains an employee manual, which employees sign, requiring employees to maintain the confidentiality of ResMan's information.

12.  ResMan maintains physical and electronic protections over the ResMan Platform, marks certain documents with internal use restrictions and copyright protections, and actively polices the unauthorized disclosure and use of its confidential information.

13.  ResMan has given demonstrations of limited portions of the ResMan Platform only to potential customers and in a commercial context.

14.  On March 1, 2012, ResMan was awarded a registered copyright by the United States Copyright Office for a previous version of the ResMan Platform.  The Copyright Office requires only a fraction of the total source code to be deposited to receive a copyright on the source code.  In line with the Copyright Office's deposit requirement, ResMan disclosed, at most, 0.1% of the source code for the 2012 version of the ResMan Platform.  ResMan has not sought a registration on the 2018-19 version of the ResMan Platform that Defendants accessed and misused.

15.  Karya was founded in 2014.

16.  Karya's primary business is the management of multifamily properties in Texas and other states.

17.  Karya is owned by Swapnil Agarwal, Vivek Shah, and Manish Patel.

18.  Karya is closely affiliated with Nitya Capital, which is owned by Karya co-owners Swapnil Agarwal and Vivek Shah.

19.  On July 3, 2017, before Karya became a ResMan customer and during initial contract negotiations, ResMan sent David Flores (then Director of Acquisitions

and Asset Management for Nitya Capital, LLC) a PDF copy of the MSA, a link to the MSA on ResMan's website, and a blank order form expressly requiring Karya's agreement to the terms of the MSA as a condition of becoming a customer.  Mr. Flores sent this information—including the PDF copy of the MSA, the link to the MSA on ResMan's website, and the blank order form—to high-level Karya executives, including Swapnil Agarwal, Mark Pearson, Manish Patel, Ashwin Shetty, Robert Billings, and Jeffrey Gomez.  Karya also consulted its Legal Counsel, Mr. Pearson, regarding the terms of the MSA.

20.  On July 18, 2017, Karya executed its first order form—agreeing to the MSA—and became a ResMan customer.  Karya then executed thirteen additional and similar order forms—further agreeing each and every time to the MSA—between August 16, 2017 and February 4, 2019.  Karya's Chief Technology Officer Jeffrey Gomez was authorized to sign and did sign each of the 14 ResMan order forms on behalf of Karya.

21.  The ResMan order forms that Karya signed each state: "By signing this order form, you agree to the terms of ResMan's Master Subscription Agreement (MSA), available online at the following link: https://myresman.com/master-subscription-agreement/. The Master Subscription Agreement (the 'Agreement') constitutes a legally binding contract between Karya Management Company, LLC and ResMan, LLC, a Utah limited liability corporation." [1]

22.  From July 18, 2017 to August 4, 2019, Karya was licensed to use the password-protected ResMan Platform for certain of its multifamily properties, subject to the terms of the order forms and the MSA.

23.  Karya knew that its access to the password-protected ResMan Platform was conditioned on Karya's promise to maintain the confidentiality of the information and to use ResMan's confidential information only as authorized.

24.  Karya knew that it was obligated not to disclose ResMan's confidential information to third parties.

25.  Since at least May 2016, prior to contracting with ResMan, Karya planned to develop a property management software system.

26.  Expedien has never licensed a property management software system from anyone, including ResMan.

---

[1] This language is used verbatim in thirteen of Karya's fourteen ResMan order forms. The sole order form that uses different language instead states it is a "legally binding contract between Karma Ventures, LLC and ResMan, LLC." However, like the other order forms, this order form still designates "Karya Property Management, LLC" as the "Customer" and is signed by Karya's Chief Technology Officer Jeffrey Gomez.

7

27.     Prior to their work on Arya, neither Karya nor Expedien (nor any of their employees) had ever developed a property management software system, nor completed development of any type of comprehensive software system.

28.     ResMan requires customers to agree to ResMan's MSA—an agreement ResMan also posts on its website—before customers receive user IDs and passwords to access the ResMan Platform.

29.     Once a customer, such as Karya, executes its first order form and agrees to be bound by the MSA, that customer has the ability to create its own user IDs and passwords for accessing the ResMan Platform.

30.     According to the MSA between Karya and ResMan, Karya agreed that user IDs and passwords cannot be shared with any third party without ResMan's authorization.

31.     ResMan has never authorized Karya to share user IDs or passwords obtained from ResMan.

32.     When a customer relationship terminates, ResMan terminates the former customer's access to the password-protected ResMan Platform.

33.     In November 2017, Karya gave Expedien a user ID ("jagarwal") and password to access the ResMan Platform without ResMan's knowledge or permission.

34.     Expedien used the "jagarwal" user ID and password provided by Karya to log into the ResMan Platform eleven times between November 9, 2017 and November 28, 2017, once from Texas and ten times from India.

35.     Nitya Capital is an "affiliated company" of Karya, as that term is used in the Karya-Expedien Master Services Agreement executed on January 10, 2018.

36.     Expedien knew that Karya and ResMan were parties to the MSA.

37.     Expedien and Karya knew that Expedien was not a party to the MSA.

38.     It is common knowledge in the property management industry that access to a PMS platform is confidential.

39.     Expedien knew that using the passwords Karya illegally provided to it was improper.  Expedien intentionally chose to access the ResMan Platform despite this knowledge.

40.     On March 1, 2018, in violation of the MSA, Karya created and gave Expedien a "team" user ID ("eteam") and password to access the password-protected ResMan Platform.

41.    On March 5, 2018, in violation of the MSA, Karya created and gave Expedien another user ID ("nvarshney") and password to access the password-protected ResMan Platform.

42.    In violation of the MSA, Karya's Chief Technology Officer Jeffrey Gomez distributed and directed the distribution of these additional user IDs and passwords to Expedien's Nishant Varshney, one of the lead developers of the Arya system.

43.    In violation of the MSA, Karya also illegally provided access to the password-protected ResMan Platform to independent contractor John Greene around March 2018.

44.    In violation of the MSA, Karya also illegally provided access to the password-protected ResMan Platform to independent contractor Malik Merchant around July 31, 2018.

45.    Karya's multiple distributions of ResMan Platform user IDs and passwords were, individually and collectively, breaches of the MSA.

46.    From March 2018 to March 2019, Expedien used the "eteam" user ID—that Karya had given to Expedien—to access the ResMan Platform from India almost daily during the normal Monday-Friday work week, and predominantly during the business day in India.

47.    Expedien used the "eteam" user ID to access multiple portions of all of the ResMan Platform Modules. Expedien also accessed the ResMan Knowledge Base, which is password protected and contains instructional information about how to use various features and functions in the ResMan Platform and contains no Karya-specific information or data.

48.    Karya and Expedien jointly participated in at least 100 hours of screen-sharing teleconferences ("Screen Shares") during which Karya employees logged into the password-protected ResMan Platform, illegally shared the ResMan computer screens with Expedien, and illegally showed Expedien features, flows, and other aspects of the password-protected ResMan Platform.

49.    In addition to the above, on multiple occasions, Karya separately sent Expedien screenshots of and documents relating to the password-protected ResMan platform over email and by posting materials to a shared Google Drive.

50.    Karya and Expedien, illegally and in violation of the MSA, used ResMan's confidential information to build Arya.

51.    The use of the ResMan Platform by a direct competitor of ResMan is a violation of the MSA.

52.   Karya also gave Expedien user IDs and passwords to access RealPage, Inc.'s proprietary PMS software, in addition to user IDs and passwords of at least three other proprietary property management-related products.   As with ResMan, Defendants were not authorized by these software providers to provide access to Expedien or to use their software to develop Arya.

53.   From early 2018 to mid-2019, Expedien directly accessed the password-protected RealPage software using the user IDs and passwords provided by Karya without RealPage's permission.

54.   ResMan was first made aware of Arya in late November 2018, when ResMan's President Elizabeth Francisco attended the Multifamily Leadership Summit, at which Swapnil Agarwal spoke publicly about Arya.   Until November 2018, ResMan was not aware that Karya was developing Arya.

55.   In December 2018, Karya publicly announced Arya on Karya's Facebook and LinkedIn pages.

56.   In early 2019, ResMan sent a letter to Karya asking to discuss Arya.   Karya did not respond.   In the meantime, Karya continued to access the password-protected ResMan Platform and provide confidential information from the ResMan Platform to Expedien.   Expedien and Karya also continued to work on Arya.

57.   Only after ResMan's outside counsel contacted Karya's internal counsel did ResMan receive any response from Karya about Arya.   On March 26, 2019, Karya admitted that it had given ResMan Platform user IDs and passwords to an unnamed third-party software consultant to work on and develop Arya.

58.   Even after Expedien's direct access to the ResMan Platform was revoked, Karya continued to illegally send Expedien screenshots and other confidential information from the ResMan Platform which Expedien used to develop Arya. Expedien knew that it was not authorized to receive information from the password-protected ResMan Platform.

59.   Karya intended to use Arya both for internal purposes and to sell to third parties.

60.   ResMan terminated its contract with Karya and revoked Karya's access to the ResMan Platform effective August 4, 2019.

61.   Defendants' actions have caused ResMan harm and benefitted Defendants.

62.   The MSA obligates Karya to pay ResMan's attorneys' fees and costs incurred in enforcing the MSA.

63.   The MSA obligated Karya to comply with applicable laws.

64.     Defendants acquired ResMan's trade secrets and/or confidential or proprietary information through improper means.

65.     Defendants knew or had reason to know that ResMan's trade secrets and/or confidential or proprietary information had been acquired by improper means.

66.     Defendants knew that Karya was obligated to maintain the secrecy of ResMan's information and to only use ResMan's information as authorized by the MSA.

67.     Defendants did not independently develop or otherwise use proper means to develop the ResMan information that Defendants used.

68.     Defendants intentionally misappropriated ResMan's information and intended to cause ResMan substantial injury or harm.

69.     Alternatively, each Defendant was at minimum grossly negligent in consciously disregarding the extreme degree of risk of which it was consciously aware and proceeding with conscious indifference to ResMan's rights.

70.     Defendants' intentional misappropriation of ResMan's information resulted from Defendants' conscious disregard of ResMan's rights as the owner of the information.

71.     ResMan has complied with the MSA at all times and fully performed under the MSA.

**b)  Legal Contentions**

   1.     **Breach of Contract (Against Karya).**

         On July 18, 2017, Karya and ResMan entered into the MSA.  The MSA imposed strict use restrictions and confidentiality obligations, including but not limited to prohibiting access to the password-protected ResMan Platform by third parties and/or for the purposes of analyzing the platform to develop competing software products.

         Karya breached multiple provisions of the MSA by, among other actions, providing multiple non-transferable User IDs and passwords to the confidential ResMan Platform to its third-party contractor Expedien so that Karya and Expedien could analyze the ResMan Platform and use it to develop a competing software.

         Karya's violations of the Defend Trade Secrets Act, the Texas Uniform Trade Secrets Act, and the Computer Fraud and Abuse Act further constitute breaches of the MSA.

ResMan specifically alleges that Karya breached at least the following provisions of the MSA: Introduction, 2.7, 2.8, 3.1, 3.5, 3.6, 6.1, 7.1, 7.2, and 7.3.

ResMan was and continues to be damaged by Karya's breaches, including by the misuse of its confidential information and the use of the confidential ResMan Platform to develop a competing software.

2. **Tortious Interference with a Contract (Against Expedien).**

Expedien willfully and intentionally interfered with the known contractual agreement between ResMan and Karya by actively encouraging Karya to provide, and conspiring with Karya to receive and use on a continuing basis, Karya's ResMan Platform User IDs and passwords in violation of the MSA.

Expedien further willfully and intentionally interfered with the known contractual agreement between ResMan and Karya by accessing the password-protected ResMan Platform without authorization from ResMan on an ongoing and continual basis and by developing competing software derived from the improper access to the ResMan Platform.

3. **Misappropriation of Trade Secrets (Against All Defendants).**

The trade secrets owned by ResMan and improperly acquired by Defendants include the features, functionality, processes and screen flows, reports, ResMan Platform Modules, and ResMan Knowledge Base, individually and the foregoing compiled together as the ResMan Platform, all of which constitute secret information that is reasonably protected by ResMan and that derives independent economic value from its secrecy.

Defendants improperly acquired these trade secrets in violation of numerous provisions of the MSA and through misrepresentations.

Karya disclosed ResMan's trade secrets and both Defendants used these trade secrets without ResMan's consent to create a PMS software to directly compete with ResMan.

At the time of the disclosure and use, Defendants knew or had reason to know that Karya's knowledge of ResMan's trade secrets was acquired under circumstances giving rise to a duty to maintain the secrecy of or limit the use of the trade secrets, including the contractual duty imposed by the MSA.

Further, Expedien used ResMan's trade secrets without ResMan's consent to create competing software. Expedien, at the time of such use, knew or had reason to know that its knowledge of the trade secrets was derived from an entity, Karya, that owed a duty to the party seeking relief, ResMan, to maintain the secrecy of or limit the use of the trade secrets.

Defendants' actions have resulted in violations of the Defend Trade Secrets Act (DTSA), 18 U.S.C. § 1839, and the Texas Uniform Trade Secrets Act (TUTSA), Tex. Civ. Prac. & Rem. Code § 134A.001.

4. **Violation of Computer Fraud and Abuse Act (CFAA), 18 U.S.C. § 1030 (Against All Defendants).**

The ResMan Platform resides on ResMan's computers and on its computer network, including servers, which Defendants accessed and used in the United States and India.  Such computers, servers, and computer networks function with individual data processing devices and are used in or affect interstate and foreign commerce and communication, and are therefore a "protected computer" under 18 U.S.C. § 1030(e)(2).

Defendants knowingly and with intent to defraud accessed ResMan's protected computer without authorization or by exceeding authorized access. Through this unauthorized access, Defendants obtained information that is confidential and proprietary, and which provides a competitive advantage.

 Defendants knowingly and with intent to defraud trafficked in passwords or similar information through which a computer may be accessed without authorization, and such trafficking affected interstate or foreign commerce.

Defendants also conspired to commit and/or attempted to commit the foregoing offenses.

5. **Declaratory Judgment Pursuant to 28 U.S.C. § 2201 (Against Karya).**

As described above, Karya breached the MSA.  As a result, ResMan has suffered and will continue to suffer damages and irreparable harm.

ResMan seeks a judgment declaring that:

(a) Karya has breached one or more provisions of the MSA;

(b) ResMan was entitled to terminate the MSA;

(c) the Arya product is a derivative, improvement, enhancement and/or extension of ResMan's Platform and confidential and proprietary information;

(d) pursuant to the MSA and/or applicable law, including but not limited to under MSA ¶¶ 1.12, 1.5 and 5.1, ResMan is the rightful owner of the Arya product and all related work product;

(e) ResMan is entitled to its attorneys' fees; and

(f) any and all other declaratory relief that is appropriate and just in these circumstances.

6. **Relief Sought.**

ResMan seeks the following damages and relief in this action:

i. Direct, incidental, consequential, and all other forms of general or special compensatory damages, for the harm to ResMan's business and/or property, including, without limitation, ResMan's lost profits, reasonable royalties, and expenses incurred in investigating, responding to, or remediating Defendants' misconduct;

ii. Disgorgement to ResMan of Defendants' unjust or ill-gotten gains, restitution, or any similar legal or equitable relief;

iii. Exemplary and/or punitive damages in the maximum amount allowed under the U.S. Constitution and other applicable state and federal law;

iv. All fees and costs of suit, including attorneys' fees, expert witness fees, taxable and nontaxable costs, and any other expenses related in any way to the investigation, litigation, and resolution of this lawsuit;

v. Pre-judgment and post-judgment interest at the maximum rate permitted by law or in equity;

vi. Injunctive relief, as appropriate to remedy any harm to ResMan, remediate any unjust gains Defendants have obtained, and prevent any further such unjust gains;

vii. Declaratory judgment; and

viii. All other and further relief warranted by the evidence, Defendants' conduct, or as the Court deems just and equitable.

_**Defendants' Contentions:**_

_**a. Factual Contentions**_

1. Amongst ResMan's various products and services, ResMan offers a property management software ("PMS") platform for multifamily property managers, owners, and operators called ResMan Multifamily (hereinafter "ResMan software," "ResMan platform" or "ResMan PMS"), which is the software at issue

in this dispute.  ResMan's other software offerings include ResMan Commercial, ResMan Affordable, and ResMan Marketing.

2.  ResMan has authorized the use or disclosure of the ResMan software without requiring the signing of an MSA, non-disclosure agreement, or any other contractual obligation in at least the following ways:

a.  On March 1, 2012, ResMan was awarded a registered copyright by the United States Copyright Office for the ResMan PMS.  The copyrighted material consists of over 50 pages of ResMan source code, which discloses approximately 100 services that form the ResMan PMS such as accounting and applicant screening.  In addition, the copyrighted material contains numerous lines of "human readable" source code comments that provide insight into the inner workings of the source code disclosed in the copyright. ResMan's copyright does not contain any redactions.

b.  Once ResMan developed the ResMan PMS, it also began to market its product by making various aspects of the ResMan PMS available to the general public without restriction.  ResMan has posted several videos, including tutorials and prerecorded webinars, on social media platforms like Vimeo and YouTube that are available to the general public.  These videos, some of which are over an hour long and provide detailed walkthroughs of ResMan features, functionality, and screens, can be viewed by the public without a confidentiality or non-disclosure agreement.  At least 44 distinct screens of the ResMan PMS have been disclosed in the videos posted to Vimeo.  ResMan posted at least nine more videos discussing various features and functions of the ResMan software to Vimeo that have since been taken down or are no longer available upon searching for ResMan's videos on Vimeo.  A ResMan customer also posted about ten hours of training videos on YouTube that showed access to and various features and functionality of the ResMan system.  ResMan only issued takedown notices on the basis that "software interface is shown" after the filing of this lawsuit, and Defendants pointed out the existence of those videos.

c.  ResMan has also disclosed the ResMan PMS to thousands of prospective customers in at least three ways without requiring them to sign a confidentiality or non-disclosure agreement.

d.  First, ResMan provides webinars, which are 15-20 minute long, prerecorded demonstrations by a ResMan representative navigating through the ResMan software.

e.  Second, ResMan is a frequent participant in trade shows, where it will have a booth set up with a ResMan representative logged into the ResMan PMS providing a 5-10 minute overview of the system.

f.   Third, ResMan offers prospective customers an in-depth demonstration of the ResMan PMS either online or at their office, which typically entails a large group of employees and can last anywhere from 45 minutes to two hours.  The demo involves a ResMan representative who is logged onto the ResMan PMS walking the prospective customer through the platform, with the customer being able to ask questions or request that specific features or functionality be demonstrated.   As a result of the demonstration, the prospective customer receives an in-depth overview of the features and functionality offered by the system, the look and feel of the system, and to see various workflows. Sometimes, ResMan will provide additional demonstrations to the prospective customer in order to advance the prospect through the sales process. ResMan's base of approximately 515-520 customers and 40 percent lead conversion rate would suggest that ResMan has provided at least 1,300 of these in-depth demonstrations online or in prospective customer offices— without any confidentiality or non-disclosure obligation.   Typically a demonstration is provided to multiple representatives of a prospective customer.

g.   ResMan's own website contains numerous disclosures of its Application Programming Interface ("API") which is provided for the specific purpose of showing third-party developers how to interact with the ResMan system and how various aspects of its internal functionality operate.   The API also discloses various aspects of the ResMan software solution such as data types, formats, structure, and input and output streams within the ResMan application and system and includes information on accessing certain of the ResMan Platform's features, including Accounts, Accounting, Leasing, Events, and Purchase Orders.

h.   ResMan only requires that one employee/representative from a customer sign the order form (not the MSA).  Yet, dozens if not hundreds, of employees per customer use the ResMan platform. The ResMan platform has no mechanism in place to ensure that these additional employees – who are not familiar with the terms of the MSA – are familiar with these restrictions.  This means that thousands of individuals—only a fraction of whom actually signed an order form—have accessed the ResMan PMS and seen its various functions and features.  ResMan does not have any mechanism in place to ensure that they are each aware of the use restrictions in the MSA.

3.   ResMan developed the desktop version of the ResMan PMS from 2008-2010 and the cloud-based version in 2011-2012.  ResMan developed both the desktop and cloud-based versions of its software from 2008-2012 for approximately $790,417. ResMan spent about $350,000 from 2008-2010 on the desktop application, and about $440,417 in 2011-2012 developing the cloud-based version of its software.

4.   Nick Olsen ("Olsen"), the head developer of the ResMan software, was still in college pursuing a bachelor's degree when ResMan's predecessor company, Sequoia Property Management, hired him in 2008 to be the sole software

developer for the ResMan software desktop application.  At the time, Olsen did not have any direct software development experience other than performing quality assurance testing while in high school for a company called Integrated Data Systems.  And prior to developing the cloud-based version of the ResMan software in 2011-2012, neither Olsen nor anyone else on his team of five software developers had experience with property management software or the broader property management field.

5.  The barriers to entering the market for property management software solutions are low in terms of the required skill, time, and expense.  At a high level, there are numerous competitors in the PMS market.  The Gartner report ResMan relies upon analyzed at least twenty to thirty competitors in the PMS market and identified over a hundred more PMS providers.  Further, RealPage, a longstanding leader in the PMS market acknowledged in its annual report to investors that it "face[s] intense competitive pressures," the "market for many of our solutions is intensely competitive, fragmented and rapidly changing," and that "[s]ome of these markets have relatively low barriers to market entry."   RealPage also projected that "[w]ith the introduction of new technologies and market entrants, [it] expect[ed] competition to intensify in the future."  In its most recent annual report issued in March 2020, RealPage even recognized that its own "existing or potential clients have developed or may develop their own solutions that may be competitive with our solutions."

6.  Karya was founded in 2014 by Swapnil Agarwal.  Since inception, Karya has grown its portfolio to over 16,000 units across the United States in the Houston, Dallas, San Antonio, Austin, Salt Lake City, Las Vegas, and Kansas City areas.  To accommodate its rapid growth, Karya now employs over 1,000 people in its corporate and various field offices.

7.  Karya has as its sole manager Swapnil Agarwal, and its members are Mr. Agarwal, Vivek Shah, and Manish Patel are also members in Karya.

8.  Karya serves as property manager for multifamily properties for which Nitya serves as sponsor.

9.  On June 26, 2017, David Ganc from ResMan provided an in-depth demonstration of the ResMan PMS to Karya representatives for approximately one and a half hours without requiring Karya to sign a non-disclosure agreement ("NDA") or other contract.  Mr. Ganc sent an NDA for Karya to sign only after the demonstration was completed.  On June 28, 2017, Karya signed the NDA but deleted a provision therein requiring Karya to aid ResMan in marketing and selling the ResMan PMS.  ResMan never responded to this change in the terms of the NDA.  Instead, without a fully executed NDA in place, it provided Karya with temporary credentials that allowed "sandbox" access to the ResMan PMS on June 29, 2017.

10.     The ResMan order forms that Karya signed each state that it contains no "complicated legal terms or tiresome passages of legal terminology" and that ResMan has "no desire to trick you."   It is only in the fine print in the last paragraph of the order form that ResMan mentions the MSA, which ResMan incorporates in the order form via a written hyperlink to the online version of the MSA found on ResMan's website.

11.     ResMan does not require customers to sign the MSA itself or acknowledge that they are aware of it.   ResMan also does not require its sales representatives to provide the customer with a copy of the MSA or to explain its terms.   The same holds true for ResMan's "Terms and Conditions" document.

12.     After the customer receives initial access to the ResMan PMS, ResMan gives the customer the authority to generate credentials to access the software.   ResMan also does not impose any limits on the number of credentials a customer can create and does not require a user to acknowledge that the platform is proprietary and/or subject to use restrictions.   And it does not incorporate a "time-out" mechanism pursuant to which a user will be automatically logged out of the ResMan PMS after a period of inactivity, thus allowing someone without credentials to access the ResMan PMS.   The result is that "thousands, if not tens of thousands, have accessed the platform," and "thousands, if not tens of thousands, have seen the various functions and how they interact and flow."

13.     Pursuant to the MSA, ResMan's customers like Karya own all right, title, and interest and any and all intellectual property rights for the data that they submit, upload, import, process, collect, produce, make available, or that result from their use of the ResMan PMS.

14.     Once a customer signs the ResMan order form, ResMan does not take any measures to monitor customer use of the ResMan PMS apart from relying on customers' adherence to the MSA.   Although ResMan does not take any additional measures to monitor customer access to the ResMan PMS, it does possess the capability to create information security protocols whereby it could control the credentials that customers generate.   ResMan also does not take advantage of its ability—through its data tracking when a customer creates credentials, how often the ResMan PMS is accessed, and the geographic locations of access—to create protocols through which it can identify red flags indicating unauthorized use or disclosure of the ResMan PMS.

15.     When a customer relationship terminates, ResMan terminates the former customer's access to the ResMan Platform.   However, ResMan does not require that the former customer return ResMan training manuals, user manuals, reports, and other documentation related to the ResMan software.   None of ResMan's documents are marked as "confidential," "proprietary," or contain any notice that they are subject to confidentiality restrictions.

16.     Pursuant to Section 2.1 of the MSA, ResMan agreed to make the software services purchased by Karya in the work order forms available to Karya for the applicable term.  Moreover, pursuant to Section 2.7 of the MSA, ResMan agreed to provide customer support services to Karya for the software services purchased by Karya for the entirety of the applicable term.  Pursuant to Section 6.2.3 of the MSA, ResMan warranted that it would "perform within the terms of [the MSA] and the other documentation and specifications provided by ResMan to [Karya]." Included in this "other documentation and specifications" was ResMan's pricing proposal to Karya dated June 21, 2017, in which ResMan described the various software services it would provide to Karya.  These services included, among others, "ResMan Custom Financial, Operational, and Affordable Portfolio level Reporting Engine," and "functionality to integrate third party payment, screening, or revenue management partners into the workflow with custom organization branding and workflow options."

17.     Both during onboarding and during use of the ResMan software, Karya customized, configured, and altered the ResMan software's settings to suit its unique business needs.

18.     ResMan did not perform as promised as Karya regularly faced problems with various aspects of the ResMan software.  Paramount among these problems was ResMan's failure to generate custom reports that Karya had requested.  In the instances where ResMan did provide custom reporting, they would be plagued by long delays, which rendered the report less helpful as it no longer reflected timely data that Karya needed to operate its business.  The ResMan software also had problems syncing with Karya's property webpages such that critical information like unit floorplans did not properly display in the ResMan software.

19.     In addition to reporting and syncing issues, Karya encountered problems with the ResMan software's ability to integrate with third-party services.  For example, Karya was forced to devote significant time and resources to resolve issues related to multiple payments batching integration with PayLease, a third-party vendor that integrated into the ResMan software.  Furthermore, ResMan's integration with another third-party vendor, CoreLogic, lacked screening services, reporting, and support that Karya needed, thus forcing Karya to switch from CoreLogic to BetterNOI, another third-party vendor.  Moreover, because ResMan did not have a resident portal mobile application, Karya desired to partner with a third-party vendor called Aavgo, but ResMan refused to integrate Aavgo into its software for Karya's use.  These problems and failures on the part of ResMan caused Karya to incur unnecessary lost time, resources, and expense to resolve or work around in order to perform its property management functions.

20.     Karya regularly contacted the ResMan HelpDesk, which was supposed to provide Karya with customer support in order to resolve the aforementioned issues. However, ResMan sometimes failed to respond to Karya's customer support requests altogether, forcing Karya to escalate the issue with its designated ResMan representative, who would apologize for ResMan's non-responsiveness

and inability to resolve the problems with the ResMan software.  ResMan's failure and delays in responding to Karya's customer support requests—let alone its inability to resolve them—caused Karya to incur unnecessary lost time, resources, and expense to resolve or work around these issues in order to perform its property management functions.  Starting in July 2018, Karya began cancelling ResMan's tenant screening services for 21 of its properties.

21.     As a result of the frustrations and shortcomings it experienced using ResMan and other available solutions, Karya decided to develop its own property management software and engaged Expedien in that effort in late 2017.  In doing so, Defendants set out to create a different property management software system than ResMan.

22.     In preparing its proposal, Statement of Work, and systems context to Karya for the Arya project, Expedien reviewed a variety of sources including PMS platforms like ResMan, RealPage, Buildium, AppFolio, Entrata, and Yardi, books and articles such as "Property Management A-Z" by Dick Jonilonis, videos demonstrating various PMS platforms, and websites like Capterra comparing PMS solutions and their features.  In addition, Ashwin Shetty, Karya's Chief Operating Officer, identified and explained to Expedien the modules that Karya wanted to be included in its in-house software platform.

23.     Expedien assumed that Karya and ResMan had likely signed a contract but was otherwise unaware of its terms.

24.     Defendants' development of the Arya software included, among other things, the following:

a.     Beginning in February 2018, Karya and Expedien held weekly teleconferences and workshops in which Karya corporate staff like Sayde Camacho and regional managers like Bushra Majeed and Kathy Maxie explained Karya's business processes and provided feedback on the initial workflow and requirements documents that Expedien drafted for the different sections and modules of the Arya software.  These workshops included screen sharing to facilitate communication.

b.     Karya also provided Expedien with its own templates, application forms, checklists, and training manuals used by property staff so that Expedien could further understand Karya's workflows and incorporate the documents' content into the software specifications being developed.  Karya also provided Expedien with an Excel-based, custom tool that it had developed for accounting.

c.     Also in February 2018, one of the Expedien project managers, Nishant Varshney, visited Karya's offices in Houston for about six to seven weeks, in which time he learned from Karya corporate and regional managers about Karya's business processes, workflows, and requirements for an in-house

software platform.  He also made on-site visits to Karya's properties where he discussed Karya's business needs and current pain points with property managers.

d.  Karya and Expedien also hired John Greene in March 2018 to serve as a subject matter expert given his previous experience developing his own property management software platform and working for a property management company.  Karya and Expedien also hired Malik Merchant in July 2018 to serve as Karya's project coordinator in Karya's Houston office in an effort to streamline communication channels and productivity between Karya and Expedien as development continued through the rest of 2018 and into 2019.

e.  As work on the requirements of some modules and coding on others continued into early 2019, Karya and Expedien continued to hold teleconferences as necessary to address specific questions that Expedien had about particular Karya business processes or workflows.

f.  By March 2019, Expedien had completed the requirements for all Arya modules and had completed enough coding on certain modules to issue Release 1 for user acceptance testing ("UAT").  UAT took place for a period of a few weeks to months and entailed testing the Arya prototype modules to confirm that they met the requirements that Karya and Expedien had identified.  In no part of testing did the UAT team refer to or make comparisons with the ResMan software platform.  Rather, the UAT team ran the Arya prototype through scenarios of Karya business processes that it had devised such as entering a guest card or lease application, and provided Expedien with feedback after observing how the Arya prototype handled the scenarios.

25.  Expedien and Karya shared a Google Drive folder for housing documents relevant to the Arya project.  The documents on the Google Drive were accessed and shared on an as-needed basis such that permissions were required to access certain folders or documents.

26.  While Expedien initially estimated a one-year timeline to develop Arya, it encountered delays (typical of a software development project) that resulted in a revised Statement of Work in June 2018.  By January 2020—almost two years since beginning work on the Arya project—Expedien had completed coding for Release 1 modules and the large majority of Release 2 modules, all of which require and are awaiting testing by Karya.

27.  From February 2018 through December 2019, the Arya project cost Karya approximately $1,359,527.85 in fees billed by Expedien.  This cost does not reflect the hundreds (if not thousands) of hours of additional time and resources

spent by Karya employees who assisted Expedien in the software development process.

28.     Defendants neither had access to nor used ResMan's source code, architecture, or other back-end information in developing Arya.

29.     Defendants' only access to ResMan was on the front end of the software as an end user.

30.     The practice of discussing concerns and pain points with existing software solutions is legitimate and pervasive in the industry, and one that ResMan itself regularly engages in as part of its marketing efforts.   ResMan's sales representatives have a practice of conducting "discovery" calls with potential new customers, during which ResMan sales representative ask the potential customer a standard set of questions and then record his/her responses.  The form that is used as the script for the call, and into which the answers are recorded, starts by asking the potential customer which software solution they are currently using and then includes a section titled "Pain Points & Motivation."   The Pain Points & Motivation section includes questions such as:

- What are some of the challenges you're looking to solve aside from the hefty cost?
- Is there anything that you feel you are not getting from your current solution that you would want from a product or support standpoint?
- What do you like most about the current software solutions that you utilize?
- How do you feel about the support you currently experience from your providers?
- How does your onsite team and other stakeholders feel about the current solution?

ResMan's Sr. Vice President of Sales, Greg Demski, described the purpose of the discovery call as designed to "understand [the potential customer's] needs, pain points, different solutions that they're currently using today, what they like, what they don't like, then we will determine if there's a buying criteria and it's a – a viable prospect that meets the needs of our services."

ResMan's own marketing brochure also proudly states that ResMan was "[b]uilt by property managers for property managers" and "intimately knows the shortcomings of the available software in the market and has used that knowledge to build a best-in-class solution."

31.     ResMan also commissioned Sterling Associates to conduct a "confidential market due diligence report" based on more substantive, "in-depth ResMan customer interviews, as well as in-depth interviews of users of other property management software," which involved discussions of customers' pain points with different property management software platforms.

22

32.  Olsen, ResMan's lead software developer and current Vice President of
     Development, highlighted as one of his achievements in developing the ResMan
     software "interview[ing] and document[ing] industry professionals on their
     struggles and difficulties with current solutions provided by the market."

33.  Karya and Expedien recorded approximately 50 of their weekly teleconferences
     and workshops that lasted for an estimated total of 100-200 hours.  Out of these
     recordings, ResMan has identified five in which ResMan screens are shown.
     ResMan's own evidence further indicates that, at most, the ResMan PMS was
     shown for approximately two hours and 40 minutes out of an estimated total 100-
     200 hours of screen sharing.

     In addition, at least one of the recordings cited by ResMan does not show the
     functions or features of the ResMan PMS itself, but rather, the operation and
     integration of a third-party applicant screening service called Blue Moon.   As
     Sayde Camacho ("Camacho") shows Expedien in the video, ResMan simply
     populates its applicant screening form with content directly from one of two
     sources: (1) Blue Moon, which itself uses publicly available forms from the Texas
     Apartment Association; or (2) forms created by Karya.   Camacho also states
     more than once that Karya does not want Arya's integration with Blue Moon to be
     done like ResMan, which she describes as "very confusing."

     Without the Blue Moon recording, which runs for about one hour and ten
     minutes, Karya showed the ResMan PMS to Expedien during screen sharing for
     merely one and a half hours, or 0.75-1.5% of the total teleconference recording
     time.  And in this short span, Karya and Expedien view screens that ResMan itself
     has publicly disclosed in several marketing videos such as its "Boardroom"
     layout.

34.  The ResMan and Arya platforms do not share the same look and feel on the front
     end of the software.   The ResMan and Arya platforms also have significant
     technical, functional, and aesthetic differences.

35.  Unlike ResMan, the Arya software does not implement traditional reporting tools.
     Instead, Arya implements "smart tables" to provide Karya with a tailored, flexible
     approach to report creation that was lacking in ResMan.

36.  To the extent the Arya software contains similar modules and functionalities as
     the ResMan PMS, this is due to the fact that certain core functions and features
     are common across PMS platforms.  In describing the work he performed to
     develop the ResMan software in 2008-2011 on his LinkedIn profile, Olsen stated
     that he "[t]ranslated common workflows and processes used by those in the
     industry into simple and easy to use software solutions."   As a result, in
     comparing ResMan's features and functionality with other PMS products on the
     market, Olsen explained that "[i]t's the same business" with similar workflows;

differences arise amongst competing PMS platforms in the way they execute the common set of workflows and processes."

37.     The Pendo software data on which ResMan relies to show the alleged volume of Expedien's access to the ResMan software is unreliable and flawed.   The "Duration" field, for example, purports to identify the amount of time Expedien spent on each page in milliseconds.   But numerous entries are in the single digits—implying that a user viewed a page in a matter of *single milliseconds*—while others are inexplicably listed at 0.   Further, hundreds of entries have the exact same numerical value, suggesting that Expedien spent the exact same amount of time viewing numerous pages *to the millisecond*—a practically impossible result.

38.     ResMan terminated its contract with Karya and revoked Karya's access to the ResMan Platform effective August 4, 2019 despite Karya's request that the parties extend the contract and Karya to continue compensating ResMan for its services for at least 180 days after receiving notice of ResMan's intent to terminate, but ResMan refused.

**b.**     *Legal Contentions*

Breach of Contract

1.     Karya contends that ResMan cannot meet its burden of proving, by a preponderance of the evidence, that Karya breached the MSA.

2.     Karya contends that ResMan cannot meet its burden of proving, by a preponderance of the evidence, that the entire ResMan PMS is "Confidential Information" pursuant to the MSA.

3.     Karya contends that ResMan cannot meet its burden of proving, by a preponderance of the evidence, that Defendants copied or reverse-engineered the ResMan PMS in developing the Arya PMS.

4.     Karya contends that ResMan's claims are barred by ResMan's first material breach of the MSA.

5.     Karya contends that ResMan cannot meet its burden of proving, by a preponderance of the evidence, that Karya's alleged breach proximately caused ResMan damages.

6.     Karya contends that ResMan cannot meet its burden of proving, by a preponderance of the evidence, that it has incurred damages, if any, caused by Karya's alleged breach of the MSA or the dollar amount thereof.

Tortious Interference

1.      Expedien contends that ResMan's tortious interference claim is preempted by its claims pursuant to the Texas Uniform Trade Secrets Act.

2.      Expedien contends that ResMan cannot meet its burden of proving, by a preponderance of the evidence, that Expedien was aware or had knowledge of the terms of the MSA between Karya and ResMan.

3.      Expedien contends that ResMan cannot meet its burden of proving, by a preponderance of the evidence, that Expedien willfully and intentionally interfered with the ResMan-Karya MSA.

4.      Expedien contends that ResMan cannot meet its burden of proving, by a preponderance of the evidence, that Expedien's alleged interference proximately caused ResMan damages.

5.      Expedien contends that ResMan cannot meet its burden of proving, by a preponderance of the evidence, that it has incurred damages, if any, caused by Expedien's alleged interference or the dollar amount thereof.

<u>Misappropriation of Trade Secrets</u>

1.      Defendants contend that ResMan has failed to identify its alleged trade secrets with sufficient particularity.

2.      Defendants contend that ResMan cannot meet its burden of proving, by a preponderance of the evidence, that ResMan has information that:

    (i)     derives independent economic value from not being generally known or readily ascertainable through proper means by another person who can obtain economic value from the disclosure or use of the information; and

    (ii)    ResMan has taken reasonable measures to protect as secret.

3.      Defendants contend that ResMan cannot meet its burden of proving, by a preponderance of the evidence, that its alleged trade secrets are secret and not publicly disclosed.

7.      Defendants contend that ResMan cannot meet its burden of proving, by a preponderance of the evidence, that Defendants misappropriated its alleged trade secrets, as opposed to independently developing the features about which ResMan complains or acquiring them elsewhere.

8.      Defendants contend that ResMan cannot meet its burden of proving, by a preponderance of the evidence, that features and functions that are similar in ResMan and Arya are not common to property management software in general.

9.      Defendants contend that ResMan cannot meet its burden of proving, by a preponderance of the evidence, that its entire software platform, which it claims to be a trade secret, is secret and not publicly disclosed.

10.     To the extent ResMan is found to sufficiently identify its individual trade secrets, Defendants contend that ResMan cannot meet its burden of proving, by a preponderance of the evidence, that the 165 features and eight process flows that ResMan alleges are trade secrets are not common to the PMS market, not separated from matters of general knowledge or those in the PMS market, and not plainly obvious, such as, but not limited to, the following:

- A2: system should post rent to resident ledger every month;
- A7: ability to check availability of unit;
- A10-A12: ability to add, delete, and edit employment and other income;
- A16: ability to initiate move-out;
- A21: ability to view lease information of a resident;
- A23-A24: ability to attach and delete documents;
- A25-A26: ability to print forms and documents;
- A27-A28: ability to view documents;
- A36-A37: ability to edit and view personal information for a resident;
- A38-A40: ability to add, delete, and view a pet's information;
- A41: ability to view resident's outstanding dues;
- A64: ability to look up or search resident;
- B7-B8, B11: ability to accept, decline, or cancel an application;
- B9 and B18: ability to approve or submit an application form;
- B12: ability to capture an applicant move in date;
- B28: ability to sign lease contract;
- B33: ability to print;
- C3: API interface;
- C8: system to be able to publish reports in different formats (PDF, Excel, Word, etc.);
- F5 and F8: ability to accept, make changes to, or reject purchase order; and
- H4: ability to view bills.

11.     To the extent ResMan is found to sufficiently identify its compilation trade secrets, Defendants contend that ResMan cannot meet its burden of proving, by a preponderance of the evidence, that the components in its compilation trade secrets fit together in a unique and valuable way that is not publicly known.

12.     Defendants contend that ResMan cannot meet its burden of proving, by a preponderance of the evidence, that Defendants' alleged misappropriation of the alleged trade secrets proximately caused ResMan damages.

13. Defendants contend that ResMan cannot meet its burden of proving, by a preponderance of the evidence, that it incurred damages caused by Defendants' alleged misappropriation of the alleged trade secrets or the dollar amount thereof.

14. Defendants contend that ResMan cannot meet its burden of proving, by clear and convincing evidence, that Defendants' alleged misappropriation was willful and malicious.

CFAA

1. Defendants contend that ResMan cannot meet its burden of proving, by a preponderance of the evidence, that Defendants have:

   a. Intentionally accessed a computer without authorization or exceeded authorized access, and thereby obtained information from ResMan's protected computer;

   b. Knowingly and with intent to defraud accessed ResMan's protected computer without authorization or exceeded authorized access, and obtained anything of value; or

   c. Knowingly and with intent to defraud trafficked in passwords or similar information through which a computer may be accessed without authorization, and such trafficking affected interstate or foreign commerce.

2. Defendants contend that ResMan cannot meet its burden of proving, by a preponderance of the evidence, that it has incurred investigative costs or the dollar amount thereof.

3. Defendants contend that ResMan cannot meet its burden of proving, by a preponderance of the evidence, that its alleged investigative costs were reasonable and separate from litigation expenses.

Declaratory Judgment

1. Defendants contend that the Court should decline to decide ResMan's claims for declaratory judgment as such claims are redundant of ResMan's affirmative claims. *See St. Paul Ins. Co. v. Trejo*, 39 F.3d 585, 590-91 (5th Cir. 1994); *Rail Scale, Inc. v. Balanced Railscale Certification, LLC*, No. 2:15-CV-02117-RSP, 2017 WL 319077, at *2 (E.D. Tex. Jan. 23, 2017). Defendants additionally incorporate by reference the contested issues identified in this section as well as:

2. Defendants contend that ResMan cannot meet its burden of proving, by a preponderance of the evidence, that Karya was in breach of the MSA.

3.      Defendants contend that ResMan cannot meet its burden of proving, by a preponderance of the evidence, that it was entitled to terminate the MSA.

4.      Defendants contend that ResMan cannot meet its burden of proving, by a preponderance of the evidence, that Arya is a derivative, improvement, enhancement, and/or extension of ResMan's software.

5.      Defendants contend that ResMan cannot meet its burden of proving, by a preponderance of the evidence, that Karya is not the rightful owner of the Arya software.

Monetary Damages (with respect to claims for breach of contract, tortious interference, misappropriation of trade secrets, CFAA violations, and declaratory judgment)

1.      Defendants contend that ResMan cannot meet its burden of proving, by a preponderance of the evidence, its lost profits caused by any particular aspect of the Defendants' alleged conduct or by the conduct viewed as a whole.

2.      Defendants contend that ResMan has not adequately disaggregated or differentiated the damages it allegedly suffered as a result of Defendants' conduct from losses attributable to other causes and/or conduct that was not a violation of ResMan's legal rights.

3.      Defendants contend that ResMan cannot meet its burden of proving, by a preponderance of the evidence, a reasonable royalty on future revenue from sales of the Arya software.

4.      Defendants contend that the attorneys' fees and expenses that ResMan incurred in this lawsuit were neither reasonable nor necessary.

Injunctive Relief

1.      Defendants contend that ResMan cannot meet its burden of proving, by a preponderance of the evidence, that it has suffered irreparable injury proximately caused by Defendants' alleged conduct.

2.      Defendants contend that ResMan cannot meet its burden of proving, by a preponderance of the evidence, that its alleged injury outweighs the damage that the relief sought would cause Defendants.

3.      Defendants contend that ResMan cannot meet its burden of proving, by a preponderance of the evidence, that remedies available at law are inadequate to compensate for ResMan's alleged injury.

4.      Defendants contend that ResMan cannot meet its burden of proving, by a preponderance of the evidence, that the public interest would not be disserved by a permanent injunction.

5.      Defendants contend that ResMan cannot demonstrate that the scope of the injunctive relief it seeks is proportional to the alleged harm it is intended to prevent, or that it is the most narrowly tailored relief available to address the alleged irreparable injury.


**E.      STIPULATIONS AND UNCONTESTED FACTS**

1.      ResMan is a limited liability company with its principal place of business at 2901 Dallas Pkwy, Suite 200, Plano, Texas 75093.

2.      The ResMan Platform is a cloud-based SaaS platform hosted on Microsoft Azure servers and is used on properties in multiple states in the United States.

3.      ResMan has been developing the ResMan Platform since 2008.

4.      Since the first launch of the cloud-based version of the ResMan Platform in late 2012/early 2013, the ResMan Platform continues to be updated.

5.      The ResMan Platform includes:

   i.   at least 1,000 distinct URLs/screens;

   ii.  core modules including: Leasing (which includes Prospects and Lead Management, Applicant, and Resident), Maintenance, Accounting (which includes Accounts Receivable, Accounts Payable, and Cash Management), Property Configuration, Administration, Reporting, and Tools (the "ResMan Platform Modules");

   iii. reporting capabilities which allow users the ability to generate over 200 reports; and

   iv.  a Knowledge Base, containing instructional information about how to use various features and functions in the ResMan Platform.

6.      Karya is a Texas limited liability company with its principal place of business at 8901 Gaylord Drive, Suite 100, Houston, Texas 77024.

7.      Karya has always—up to and including the present—managed its properties using property management software systems licensed from a property management software provider—specifically, ResMan, Entrata, Inc. ("Entrata"), RealPage, Inc. ("RealPage"), and/or AppFolio, Inc. ("AppFolio").

8.  On July 18, 2017, Karya executed its first order form and became a ResMan customer.  Karya then executed thirteen additional order forms between August 16, 2017 and February 4, 2019.  Karya's Chief Technology Officer Jeffrey Gomez was authorized to sign and signed each of the 14 ResMan order forms on behalf of Karya.

9.  Expedien is a corporation with its principal place of business at 13710 Creek Lane, Houston, Texas 77077.  Expedien also maintains offices in Gurgaon, India.

10. In late 2017, Karya and Expedien initiated discussions about designing and developing a property management software system for Karya, which Defendants later named Arya.

11. The ResMan Platform cannot be accessed without a user ID and password.

12. Upon executing their first order form, ResMan customers, including Karya, are provided a user ID and password to access the ResMan Platform.

13. Once a customer, such as Karya, executes its first order form, that customer has the ability to create its own user IDs and passwords for accessing the ResMan Platform.

14. When customers log into the ResMan Platform, they access the cloud-based portions of the Platform, the servers upon which the Platform is hosted, and the network upon which the Platform runs.

15. In November 2017, Karya gave Expedien a user ID ("jagarwal") and password to access the ResMan Platform.

16. On January 8, 2018, Karya and its affiliated companies and Expedien executed a Master Services Agreement ("Karya-Expedien Master Services Agreement") to govern the design and development of Arya, effective as of December 19, 2017.

17. Swapnil Agarwal was authorized to sign and signed the Karya-Expedien Master Services Agreement on behalf of Karya and its affiliated companies.  Jiten Agarwal was authorized to sign and signed the Karya-Expedien Master Services Agreement on behalf of Expedien.

18. Karya and Expedien executed their first Statement of Work under the Karya-Expedien Master Services Agreement on January 10, 2018.

19. On March 1, 2018, Karya gave Expedien a second user ID ("eteam") and password to access the ResMan Platform.

20. On March 5, 2018, Karya gave Expedien a third user ID ("nvarshney") and password to the ResMan Platform.

21.     Karya's Chief Technology Officer Jeffrey Gomez distributed and directed the distribution of these additional user IDs and passwords to Expedien's Nishant Varshney.

22.     Karya also provided access to the ResMan Platform to Expedien's independent contractor John Greene around March 2018.

23.     Karya also provided access to the ResMan Platform to Expedien's independent contractor Malik Merchant around July 31, 2018.

24.     Karya's CEO, Swapnil Agarwal, publicly announced that Karya was building the Arya software at the Multifamily Leadership Summit in Scottsdale, Arizona in November 2018.  In attendance was ResMan's President, Elizabeth Francisco.

25.     In December 2018, Karya publicly marketed the fact that it was working on Arya in a video posted to Karya's Facebook and LinkedIn pages.

## F.     CONTESTED ISSUES OF FACT AND LAW

### _Plaintiff's Statement of Contested Issues_

Breach of Contract

1.   Whether Karya breached the MSA.

2.   The extent to which ResMan was damaged by Karya's breaches of the MSA.

3.   Whether, as a result of Karya's breaches of the MSA, ResMan suffered irreparable harm for which money damages do not provide an adequate remedy.

4.   The amount of damages, attorneys' fees, costs, and expenses and the nature of the injunctive relief to be assessed against Karya as a result of Karya's breaches of the MSA.

Tortious Interference

1.   Whether Expedien tortiously interfered with the MSA between ResMan and Karya.

2.   The extent to which ResMan was damaged by Expedien's tortious interference with the MSA between ResMan and Karya.

3.   The extent to which the harm caused by Expedien's wrongful conduct results from fraud, malice, or gross negligence.

4.   Whether, as a result of Expedien's tortious interference, ResMan suffered irreparable harm for which money damages do not provide an adequate remedy.

5.  The amounts of actual and punitive damages and the nature of the injunctive relief to be assessed against Expedien as a result of its tortious interference.

<u>Misappropriation of Trade Secrets (State and Federal)</u>

1.  Whether the ResMan information that Karya and/or Expedien obtained and/or used in the formation of Arya constituted or contained one or more of ResMan's trade secrets.  Specifically:

    a.  Whether ResMan has information;

    b.  Whether ResMan's information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information; and

    c.  Whether ResMan has taken reasonable measures under the circumstances to keep the information secret.

2.  Whether Defendants have misappropriated ResMan's trade secrets by one or more of the following:

    a.  Acquiring ResMan's trade secrets with knowledge or reason to know that the trade secrets were acquired by improper means;

    b.  Using and/or disclosing ResMan's trade secrets without ResMan's consent, after having used improper means to acquire knowledge of ResMan's trade secrets;

    c.  Using and/or disclosing ResMan's trade secrets without ResMan's consent, and, at the time of the disclosure and/or use, knowing or having reason to know that knowledge of ResMan's trade secrets was derived from or through a person who used improper means to acquire the trade secret;

    d.  Using and/or disclosing ResMan's trade secrets without ResMan's consent, and, at the time of the disclosure and/or use, knowing or having reason to know that Karya's knowledge of ResMan's trade secrets was acquired under circumstances giving rise to a duty to maintain the secrecy of or limit the use of the trade secrets; *or*

    e.  Using and/or disclosing ResMan's trade secrets without ResMan's consent, and, at the time of the disclosure and/or use, knowing or having reason to know that knowledge of ResMan's trade secrets was derived

from or through a person who owed a duty to ResMan to maintain the secrecy of or limit the use of the trade secret.

3. Whether Defendants' misappropriation was willful and malicious.

4. The extent to which ResMan was damaged by Defendants' misappropriation of ResMan's trade secrets.

5. Whether, as a result of Defendants' misappropriation of ResMan's trade secrets, ResMan suffered irreparable harm for which money damages do not provide an adequate remedy.

6. The amounts of actual and punitive damages, attorneys' fees, costs, and expenses and the nature of the injunctive relief to be assessed against Defendants for the misappropriation of ResMan's trade secrets.

Violation of Computer Fraud and Abuse Act

1. Whether Defendants are liable under the Computer Fraud and Abuse Act by doing one or more of the following:

   a. Intentionally accessing a computer without authorization or by exceeding authorized access, and thereby obtaining information from ResMan's protected computer;

   b. Knowingly and with intent to defraud accessing ResMan's protected computer without authorization or by exceeding authorized access, and obtaining anything of value; *or*

   c. Knowingly and with intent to defraud trafficked in passwords or similar information through which a computer may be accessed without authorization, and such trafficking affected interstate or foreign commerce.

2. Whether Defendants conspired to commit and/or attempted to commit any of the foregoing acts.

3. The extent to which ResMan was damaged by Defendants' violations of the Computer Fraud and Abuse Act.

4. The amount of actual damages and the nature of injunctive relief to be assessed against Defendants for their violations of the Computer Fraud and Abuse Act.

Declaratory Judgment

1. Whether Karya breached one or more provisions of the MSA.

33

2. Whether ResMan was entitled to terminate the MSA.

3. Whether Arya is a derivative, improvement, enhancement and/or extension of ResMan's Platform and/or ResMan's other confidential and proprietary information.

4. Whether, pursuant to the MSA, ResMan is the rightful owner of Arya and all related work product.

5. The amount of attorneys' fees, costs, and expenses to which ResMan is entitled.

### *Defendants' Statement of Contested Issues*

Defendants reserve the right to supplement these contested issues of law and fact based on forthcoming rulings on the pending motions listed in section I, *infra*.

Breach of Contract

1. Whether ResMan has proven by a preponderance of the evidence that Karya breached the MSA.

2. Whether Karya has proven by a preponderance of the evidence that ResMan committed the first material breach of the MSA.

3. Whether ResMan has proven by a preponderance of the evidence that Karya's alleged breach proximately caused ResMan damages.

4. Whether ResMan has proven by a preponderance of the evidence that it has incurred damages, if any, caused by Karya's alleged breach of the MSA, and if so, the dollar amount thereof.

Tortious Interference

1. Whether ResMan has proven by a preponderance of the evidence that Expedien was aware or had knowledge of the terms of the MSA between Karya and ResMan.

2. Whether ResMan has proven by a preponderance of the evidence that Expedien willfully and intentionally interfered with the ResMan-Karya MSA.

3. Whether ResMan has proven by a preponderance of the evidence that Expedien's alleged interference proximately caused ResMan damages.

4.   Whether ResMan has proven by a preponderance of the evidence that it has incurred damages, if any, caused by Expedien's alleged interference, and if so, the dollar amount thereof.

Misappropriation of Trade Secrets

1.   Whether ResMan has identified its alleged trade secrets with sufficient particularity.

2.   Whether ResMan has proven by a preponderance of the evidence that ResMan has information that:

    (i)    derives independent economic value from not being generally known or readily ascertainable through proper means by another person who can obtain economic value from the disclosure or use of the information; and

    (ii)    ResMan has taken reasonable measures to protect as secret.

3.   Whether ResMan has proven by a preponderance of the evidence that its alleged trade secrets are secret and not publicly disclosed.

5.   Whether ResMan has proven by a preponderance of the evidence that Defendants misappropriated its alleged trade secrets, as opposed to independently developing the features about which ResMan complains or acquiring them elsewhere.

6.   Whether ResMan has proven by a preponderance of the evidence that features and functions that are similar in ResMan and Arya are not common to property management software in general.

7.   Whether ResMan has proven by a preponderance of the evidence that Defendants' alleged misappropriation proximately caused ResMan damages.

8.   Whether ResMan has proven by a preponderance of the evidence that it incurred damages caused by Defendants' alleged misappropriation, and if so, the dollar amount thereof.

9.   Whether ResMan has proven by clear and convincing evidence that Defendants' alleged misappropriation was willful and malicious.

CFAA

1.   Whether ResMan has proven by a preponderance of the evidence that Defendants have:

    a.  Intentionally accessed a computer without authorization or exceeded authorized access, and thereby obtained information from ResMan's protected computer;

    b.  Knowingly and with intent to defraud accessed ResMan's protected computer without authorization or exceeded authorized access, and obtained anything of value; or

    c.  Knowingly and with intent to defraud trafficked in passwords or similar information through which a computer may be accessed without authorization, and such trafficking affected interstate or foreign commerce.

2. Whether ResMan has proven by a preponderance of the evidence that it has incurred investigative costs, and if so, the dollar amount thereof.

3. Whether ResMan has proven by a preponderance of the evidence that its alleged investigative costs were reasonable.

Declaratory Judgment

Defendants believe that the Court should decline to decide ResMan's claims for declaratory judgment as such claims are redundant of ResMan's affirmative claims. *See St. Paul Ins. Co. v. Trejo*, 39 F.3d 585, 590-91 (5th Cir. 1994); *Rail Scale, Inc. v. Balanced Railscale Certification, LLC*, No. 2:15-CV-02117-RSP, 2017 WL 319077, at *2 (E.D. Tex. Jan. 23, 2017). Defendants additionally incorporate by reference the contested issues identified in this section as well as:

1. Whether ResMan has proven by a preponderance of the evidence that Karya was in breach of the MSA.

2. Whether ResMan has proven by a preponderance of the evidence that it was entitled to terminate the MSA.

3. Whether ResMan has proven by a preponderance of the evidence that Arya is a derivative, improvement, enhancement, and/or extension of ResMan's software.

4. Whether ResMan have proven by a preponderance of the evidence that Karya is not the rightful owner of the Arya software.

Monetary Damages (with respect to claims for breach of contract, tortious interference, misappropriation of trade secrets, CFAA violations, and declaratory judgment)

1. Whether ResMan has proven by a preponderance of the evidence and to a reasonable certainty its lost profits caused by Defendants' alleged conduct.

36

2. Whether ResMan has proven by a preponderance of the evidence the amount by which Defendants were unjustly enriched resulting from Defendants' alleged conduct.

3. Whether ResMan has adequately disaggregated or differentiated the damages it allegedly suffered as a result of Defendants' conduct from losses attributable to other causes and/or conduct that were not in violation of ResMan's legal rights.

4. Whether ResMan has proven by a preponderance of the evidence a reasonable royalty on future revenue from sales of the Arya software.

5. Whether the attorneys' fees and expenses that ResMan incurred in this lawsuit were reasonable and necessary.

Injunctive Relief

1. Whether ResMan has proven by a preponderance of the evidence that it has suffered irreparable injury proximately caused by Defendants' alleged conduct.

2. Whether ResMan has proven by a preponderance of the evidence that its alleged injury outweighs the damage that the relief sought would cause Defendants.

3. Whether ResMan has proven by a preponderance of the evidence that remedies available at law are inadequate to compensate for ResMan's alleged injury.

4. Whether ResMan has proven by a preponderance of the evidence that the public interest would not be disserved by a permanent injunction.

5. Whether the scope of the injunctive relief sought by ResMan is proportional to the alleged harm it is intended to prevent and is the most narrowly tailored relief available to address the alleged irreparable injury.

Affirmative Defenses

1. Whether Karya has satisfied its burden of proof that ResMan's claims are barred by ResMan's first material breach of the MSA and related documents.

**G.    LIST OF WITNESSES**

Plaintiff's Witness List is attached hereto as Exhibit 1.

Defendants' Witness List is attached hereto as Exhibit 2.

**H.    LIST OF EXHIBITS**

Plaintiff's Exhibit List is attached hereto as Exhibit 3.

Defendants' Exhibit List is attached hereto as Exhibit 4.

**I.      LIST OF ANY PENDING MOTIONS**

- Defendants' Motion for Summary Judgment on Plaintiff's Claims for Attorneys' Fees (Dkt. 91)

- Defendants' Motion to Strike Expert Testimony of Steven R. Kursh (Dkt. 102)

- Defendants' Motion for Partial Summary Judgment on Plaintiff's Claims for Misappropriation of Trade Secrets (Dkt. 105)

- Plaintiff's Amended Motion for Summary Judgment (Dkt. 117)

- Plaintiff's Motion to Strike Expert Testimony of Michael C. Brogioli (Dkt. 131)

**J.      PROBABLE LENGTH OF TRIAL**

Plaintiff believes the probable length of trial is ten days.  Plaintiff believes that (i) each side should have 30 hours to present its case, excluding opening and closing, and reserve the right to seek additional time upon a showing of good cause; (ii) opening statements should be 45 minutes for each side; and (iii) closing arguments should be 60 minutes for each side.

Defendants believe the probable length of trial is seven days.

**K.      MANAGEMENT CONFERENCE LIMITATIONS**

In addition to the limitations from the Court, the parties propose that, in order to facilitate a trial that is more orderly and efficiently utilizes the time and resources of the Court, jury, and parties, the Court should adopt the proposals contained herein at Exhibit 5 (titled Stipulated Trial Agreement) as applying to the trial of this case.

**L.      CERTIFICATIONS**

The undersigned counsel for each of the parties in this action do hereby certify and acknowledge the following:

(1) Full and complete disclosure has been made in accordance with the Federal Rules of Civil Procedure and the Court's orders;

(2) Discovery limitations set forth in the Federal Rules of Civil Procedure, the Local Rules, and the Court's orders have been complied with;

(3) Each exhibit in the List of Exhibits herein:
      (a) is in existence;

(b) is numbered; and

(c) has been disclosed and shown to opposing counsel.

Approved as to form and substance:

Attorneys for Plaintiff(s): _____

Attorneys for Defendant(s): _____

The Joint Pre-Trial Order is hereby approved this _____ day of _____, 2020.

Respectfully submitted,

By:     */s/ Maria Wyckoff Boyce*
        Maria Wyckoff Boyce, Lead Attorney
        Texas SBN 22095050
        maria.boyce@hoganlovells.com
        Cristina Espinosa Rodriguez
        Texas SBN 00793701
        cristina.rodriguez@hoganlovells.com
        Jillian C. Beck
        Texas SBN 24082672
        jillian.beck@hoganlovells.com
        Ira Jamshidi
        Texas SBN 24092574
        ira.jamshidi@hoganlovells.com
        S. Lee Whitesell
        Texas SBN 24093356
        lee.whitesell@hoganlovells.com
        **HOGAN LOVELLS US LLP**
        609 Main Street, Suite 4200
        Houston, Texas 77002
        T  (713) 632-1400
        F  (713) 632-1401

        Jessica L. Ellsworth (admitted pro hac vice)
        jessica.ellsworth@hoganlovells.com
        **HOGAN LOVELLS US LLP**
        555 Thirteenth Street, NW
        Washington, DC 20004
        T  (202) 637-5600
        F  (202) 637-5910

        Michael E. Jones

Texas SBN 10929400
**POTTER MINTON, P.C.**
110 North College, Ste. 500
Tyler, Texas 75702
T (903) 597-8311
F (903) 593-0846

Tommy Jacks
jacks@fr.com
Texas Bar No. 10452000
**FISH RICHARDSON P.C.**
111 Congress Avenue, Ste. 810
Austin, TX 78701
Tel: (512) 472-5070
Fax: (512) 320-8935

Daniel C. Winston (admitted pro hac vice)
dwinston@choate.com
Greta A. Fails (admitted pro hac vice)
gfails@choate.com
**CHOATE, HALL & STEWART LLP**
Two International Place
Boston, MA 02110
T (617) 248-5000
F (617) 248-4000

*Counsel for Plaintiff*
*ResMan, LLC*

By:    */s/ Michael E. Richardson*
Michael E. Richardson, Lead Attorney
State Bar No. 24002838
mrichardson@beckredden.com
Seepan V. Parseghian
State Bar No. 24099767
sparseghian@beckredden.com
BECK REDDEN LLP
1221 McKinney STREET, Suite 4500
Houston, TX 77010
Telephone:  (713) 951-3700
Facsimile:  (713) 951-3720

Richard A. Sayles
State Bar No. 17697500
dsayles@bradley.com

Mark D. Strachan
State Bar No. 19351500
mstrachan@bradley.com
BRADLEY ARANT BOULT Cummings LLP
4400 Renaissance Tower
1201 Elm Street
Dallas, Texas 75270
Telephone No. (214) 939-8700
Facsimile No. (214) 939-8787

**ATTORNEYS FOR DEFENDANTS**
**KARYA  PROPERTY  MANAGEMENT,  LLC**
**AND EXPEDIEN, INC.**

**SIGNED this 2nd day of November, 2020.**

AMOS L. MAZZANT
UNITED STATES DISTRICT JUDGE