# United States District Court

**EASTERN DISTRICT OF TEXAS**
**SHERMAN DIVISION**

| | | |
|---|---|---|
| RESMAN, LLC, | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| | § | CIVIL ACTION NO.  4:19-CV-00402 |
| v. | § | Judge Mazzant |
| | § | |
| KARYA PROPERTY MANAGEMENT, | § | |
| LLC, and SCARLET INFOTECH, INC. | § | |
| d/b/a EXPEDIEN, INC., | § | |
| | § | |
| *Defendants*. | § | |

## MEMORANDUM OPINION AND ORDER

Pending before the Court is Defendants' Rule 50(b) Motion for Judgment as a Matter of Law (Dkt. #320).  Having considered the motion and the relevant pleadings, the Court finds that Defendants' motion should be **DENIED**.

## BACKGROUND

This case involves the misuse by Karya Property Management, LLC ("Karya") and Scarlet InfoTech, Inc. d/b/a Expedien, Inc. ("Expedien") of ResMan Platform, a property management software owned by Plaintiff ResMan, LLC.  Specifically, ResMan alleges that Karya and Expedien (collectively, "Defendants") gave third parties access to the ResMan Platform (the "Platform"), aiding in the development of a competing software—Arya.  ResMan claims that Karya provided Expedien with extensive unauthorized access to ResMan's proprietary software platform for the express purposes of usurping and unfairly building upon ResMan's investments in its Platform.

ResMan's Platform provides property managers with tools designed to help manage virtually every aspect of their property management business.  ResMan claims its Platform is

confidential and proprietary.  Customers are only able to access the Platform after signing a Master Subscription Agreement ("MSA") that imposes both strict use restrictions and confidentiality obligations on the customer.  ResMan states that after signing the MSA, Karya provided to Expedien three non-transferrable User IDs and passwords to the Platform for the purpose of Expedien producing a competing software.

After a nine-day trial, the jury reached a verdict (Dkt. #287).  In its verdict, the jury found breach of contract against Karya, tortious interference with a contract against Expedien, and trade secret misappropriation against both Defendants.  The jury awarded: (1) $45,000.00 in lost profits damages arising from Karya's breach of contract; (2) $45,000.00 in lost profits damages arising from Expedien's tortious interference with a contract; (3) $11,400,000.00 in unjust enrichment damages arising from Expedien's tortious interference with a contract; (4) $30,000,000.00 in exemplary damages arising from Expedien's tortious interference with a contract; (5) $9,400,000.00 in unjust enrichment damages arising from Karya's misappropriation of ResMan's trade secrets; (6) $11,400,000.00 in unjust enrichment damages arising from Expedien's misappropriation of ResMan's trade secrets; (7) $40,000,000.00 in exemplary damages arising from Karya's misappropriation of ResMan's trade secrets; and (8) $50,000,000.00 in exemplary damages arising out of Expedien's misappropriation of ResMan's trade secrets.

On May 19, 2021, Defendants filed the present motion (Dkt. #320).  On June 2, 2021, ResMan filed a response (Dkt. #325).  On June 9, 2021, Defendants filed a reply (Dkt. #327).  On June 16, 2021, ResMan filed a sur-reply (Dkt. #329).[1]

---

[1] On June 23, 2021, Defendants filed an Objection to Arguments Raised for the First Time in ResMan's Sur-Reply in Opposition to Defendants' Rule 50(b) Motion (Dkt. #331).  On June 23, 2021, ResMan filed its Notice Regarding Defendants' Unauthorized Further Reply in Support of Motion for Judgment as a Matter of Law (Dkt. #332).  The Court has considered the notices, and notes that it does not consider any inappropriately raised arguments in reaching its decision.

## LEGAL STANDARD

Upon a party's renewed motion for judgment as a matter of law following a jury verdict, the Court should ask whether "the state of proof is such that reasonable and impartial minds could reach the conclusion the jury expressed in its verdict." *Am. Home Assurance Co. v. United Space All.*, 378 F.3d 482, 487 (5th Cir. 2004); FED. R. CIV. P. 50(a). "A JMOL may only be granted when, 'viewing the evidence in the light most favorable to the verdict, the evidence points so strongly and overwhelmingly in favor of one party that the court believes that reasonable jurors could not arrive at any contrary conclusion." *Versata Software, Inc. v. SAP Am., Inc.*, 717 F.3d 1255, 1261 (Fed. Cir. 2013) (quoting *Dresser-Rand Co. v. Virtual Automation, Inc.*, 361 F.3d 831, 838 (5th Cir. 2004)).

Under Fifth Circuit law, a court should be "especially deferential" to a jury's verdict and must not reverse the jury's findings unless substantial evidence does not support the findings. *Baisden v. I'm Ready Prods., Inc.*, 693 F.3d 491, 499 (5th Cir. 2012). "Substantial evidence is defined as evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions." *Threlkeld v. Total Petrol., Inc.*, 211 F.3d 887, 891 (5th Cir. 2000). A motion for judgment as a matter of law must be denied "unless the facts and inferences point so strongly and overwhelmingly in the movant's favor that reasonable jurors could not reach a contrary conclusion." *Baisden*, 693 F.3d at 498 (citation omitted). However, "[t]here must be more than a mere scintilla of evidence in the record to prevent judgment as a matter of law in favor of the movant." *Arismendez v. Nightingale Home Health Care, Inc.*, 493 F.3d 602, 606 (5th Cir. 2007).

In evaluating a motion for judgment as a matter of law, a court must "draw all reasonable inferences in the light most favorable to the verdict and cannot substitute other inferences that [the

court] might regard as more reasonable." *E.E.O.C. v. Boh Bros. Constr. Co.*, 731 F.3d 444, 451 (5th Cir. 2013) (en banc).  However, "[c]redibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).  "[T]he court should give credence to the evidence favoring the nonmovant as well as that 'evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that the evidence comes from disinterested witnesses.'"  *Id.* at 151 (citation omitted).

<b>ANALYSIS</b>

As an initial matter, Defendants do not seek judgment as a matter of law on ResMan's breach-of-contract claim against Karya.

However, Defendants do seek judgment as a matter of law on both ResMan's tortious interference with a contract claim against Expedien and ResMan's trade secret misappropriation claim against both Defendants.

### I.  Trade Secret Misappropriation

The jury was instructed that to find for ResMan on its trade secret misappropriation claim, ResMan had to prove: (1) "ResMan is the owner of one or more trade secrets;" (2) "Defendants misappropriated one or more such trade secrets; and" (3) "[t]he misappropriation caused damages to ResMan" (Dkt. #286 at p. 17).

Defendants contest two of the three elements found by the jury—ownership of trade secrets and damages.  Specifically, Defendants contend that ResMan has not proven ownership of any trade secret and that the damages sought by ResMan are unavailable under both the law and the evidence presented.

### a.  Existence of Trade Secret

The Court's instructions to the jury defined trade secrets as:

[A]ll forms and types of information, including business, scientific, technical, economic, or engineering information, and any formula, design, prototype, pattern, plan, compilation, program device, program, code, device, method, technique, process, procedure, financial data, or list of actual or potential customers or suppliers, whether tangible or intangible and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if:

> A. The owner of the trade secret has taken reasonable measures under the circumstances to keep the information secret; and

> B. The information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information

(Dkt. #286 at pp. 17–18); *see* 18 U.S.C. § 1839(3) (the Defend Trade Secrets Act, or "DTSA").[2]

### i.  Specificity

Defendants first advance a specificity argument, wherein the parties ultimately disagree about whether the ResMan Platform, as a whole, may properly qualify as a trade secret.  Regarding the existence of a trade secret, Defendants argue that "[p]roof of a statutory trade secrets claim requires the plaintiff to prove the alleged trade secrets with specificity" (Dkt. #320 at p. 9).  Further, Defendants assert that "ResMan's claim that the entire ResMan [P]latform is a trade secret fails as a matter of law[,]" and "ResMan failed to offer substantial evidence to support a judgment for misappropriation of particular trade secrets" (Dkt. #320 at pp. 14, 18).

ResMan responds that "[t]he [j]ury reasonably found that ResMan owned trade secrets" (Dkt. #325 at p. 7).  ResMan claims that: (1) "Defendants' 'specificity' argument ignores the trial

---

[2] The Court notes that the language of the DTSA is substantially similar to that of Texas Uniform Trade Secrets Act ("TUTSA").  No dispute appears to exist that ResMan's trade secret misappropriation claim is governed by the DTSA.

record and is legally incorrect[;]" (2) "[t]he DTSA does not contain a heightened specificity requirement[;]" (3) "[n]o 'emerging consensus' requires heightened specificity[;]" and (4) "[n]o special rules apply to software trade secrets" (Dkt. #325 at pp. 7, 8, 9, 11).

As an initial matter, what constitutes a trade secret is not easily ascertained—in fact, "[t]he term 'trade secret' is one of the most elusive and difficult concepts in the law to define." *Lear Siegler, Inc. v. Ark-Ell Springs, Inc.*, 569 F.2d 286, 288 (5th Cir. 1978).   However, upon codification of the Defend Trade Secrets Act of 2016, a broad definition was given.   Under the plain language of the DTSA, a trade secret includes "*all* forms and types of information, including . . . technical . . . information,   and   any . . . design,   prototype,   pattern, plan . . . *compilation* . . .   *program* . . . whether   tangible   or   intangible,   and   whether   or how . . . compiled[,]" so long as reasonable measures are used to ensure secrecy of the information, and the information derives independent economic value from such secrecy.   18 U.S.C. § 1839(3) (emphasis added).   Notably, the Fifth Circuit has "specifically rejected the contention that a combination of disclosed technologies cannot itself constitute a trade secret." *Tewari De-Ox Sys., Inc. v. Mountain States/Rosen, L.L.C.*, 637 F.3d 604, 613 (5th Cir. 2011).[3]   "'[A] trade secret can exist in a combination of characteristics and components, each of which, by itself, is in the public domain, but the unified process, design and operation of which in unique combination, affords a competitive advantage and is a protectable secret.'"   *Sikes v. McGraw-Edison Co.*, 665 F.2d 731, 736 (5th Cir. 1982) (quoting with approval *Imperial Chems., Ltd. v. Nat'l Distillers & Chem. Corp.*, 342 F.2d 737, 742 (2d Cir. 1965)); *see also AHS Staffing, Inc. v. Quest Staffing Grp., Inc.*,

---

[3] *Tewari* was decided pre-enactment of the DTSA.  However, *Tewari* dealt with the Texas common-law definition of a trade secret, which parallels the definition provided for by the DTSA: "a trade secret is 'any formula, pattern, device, or compilation of information which is used in one's business and presents an opportunity to obtain an advantage over competitors who do not know or use it.'"  *In re Bass*, 113 S.W.3d 735, 739 (Tex. 2003) (quoting *Computer Assocs. Int'l, Inc. v. Altai, Inc.*, 918 S.W.2d 453, 455 (Tex. 1994)).

335 F. Supp. 3d 856, 863 (E.D. Tex. 2018) ("Most importantly, even if a compilation of information consists of 'readily available' information, 'it may be protected as a trade secret given the difficulty and expense of compiling the information." (quoting *360 Mortg. Grp., LLC v. Homebridge Fin. Servs., Inc.*, No. A-14-CA-00847-SS, 2016 WL 900577, at *4 (W.D. Tex. Mar. 2, 2016)).

ResMan presented evidence that the functions, modules, and flows of its Platform, and *how* those functions, modules, and flows work together, constitute a trade secret. The jury heard testimony from Nick Olsen ("Olsen"), one of ResMan's founders, that "how [the Platform] works together . . . the work flows, how they function together, specifically how the users use the details of the application, that . . . the entirety of that application, is a trade secret" (Dkt. #297 at p. 16). Defendants did elicit testimony from Olsen that some features and functions were likely not, on their own, trade secrets due to public exposure (*see* Dkt. #297 at pp. 14–17). However, Olsen ultimately testified that ResMan did not claim trade secret status over the specific modules— rather, it was the innerworkings of the Platform as a whole (*see* Dkt. #297 at p. 16). The jury further saw Olsen demonstrate how the Platform works (*see* Dkt. #296), and the jury had access to a copy of the Platform during deliberations (*see* DX1).

ResMan also hired a trade secrets expert—Dr. Steven Kursh ("Dr. Kursh")—who testified that "even if little pieces . . . are known of the ResMan Platform, the compilation is included and qualified [as a trade secret]" (Dkt. #303 at p. 94). When asked by Defendants if Dr. Kursh could agree that "the entirety of the ResMan Platform is not a secret[,]" and "certain parts [of the Platform] are publicly known[,]" Dr. Kursh responded that he could not (Dkt. #303 at p. 87). Dr. Kursh then indicated that Olsen's statement, on which Defendants' question was based, was "a little different than what [Defendants] just said to [him] in a question" (Dkt. #303 at p. 87).

Claiming trade secret protection over the entire ResMan Platform is supported by the DTSA's broad definition of a trade secret. A software platform is certainly a form or type of technical information. Further, a platform undoubtedly qualifies as a compilation or program. Thus, no language in the DTSA prevents ResMan from attempting to prove that the Platform is, itself, a trade secret.

The Court further finds Defendants' argument regarding a heightened specificity requirement unpersuasive. The jury instructions provided that, to prove a trade secret, ResMan must "identify the information it alleges to be trade secrets with a reasonable degree of precision and specificity that is particular enough to separate the trade secret from matters of general knowledge in the trade or of special knowledge of persons skilled in the trade" (Dkt. #286 at p. 19). Additionally, nothing in the DTSA's language supports finding the existence of a heightened specificity requirement. Defendants' contention to the contrary—namely, that the DTSA imposes some higher standard than the common-law definition of a trade secret—runs contrary to the Fifth Circuit's interpretation of the relationship between the common law and Uniform Trade Secrets Act, on which TUTSA and the DTSA were based. *See Reingold v. Swiftships Inc.*, 210 F.3d 320, 322 (5th Cir. 2000) ("The Uniform [Trade Secrets] Act [of 1979] codifies the basic principles of common law trade secret protection[.]").

While ResMan certainly had to meet the DTSA's requirement of identifying a trade secret with specificity, the testimony cited above meets that threshold. As such, ResMan properly identified its entire Platform as a trade secret. Absent relevant authority establishing that a heightened specificity requirement is utilized under the DTSA to software trade secret cases, the Court declines to impose such a standard.[4]

---

[4] It is of note that Defendants have cited no authority showing such a standard is utilized in the Fifth Circuit.

Defendants' reliance on this Court's Memorandum Opinion and Order denying Defendants' Partial Motion for Summary Judgment on Plaintiff's Claims for Misappropriation of Trade Secrets (Dkt. #220) is misplaced.  While the Court's Order did admonish ResMan that it must "'identify specific groupings of information that contain trade secrets, identify the types of trade secrets contained in the groupings, and explain how the alleged trade secrets were maintained and treated as trade secrets[,]'" (Dkt. #220 at p. 5) (quoting *Vianet Grp. PLC v. Tap Acquisition, Inc.*, No. 3:14-CV-3601-B, 2016 WL 4368302, at *20 (N.D. Tex. Aug. 16, 2016)), the Court is satisfied that such specificity was met.  The Court's conclusion is further bolstered by the language immediately preceding the admonishment in the Order: "'Texas law does not require great detail in the definition of a trade secret'" (Dkt. #220 at p. 5) (quoting *GlobeRanger Corp. v. Software AG United States of Am., Inc.*, 836 F.3d 477, 501 (5th Cir. 2016)).  Because ResMan was entitled to assert its entire Platform qualifies as a trade secret, the Court now moves to the remainder of the statutory definition of a trade secret.

## ii.  **Reasonable Measures to Maintain Secrecy**

To claim trade secret protection over the Platform, ResMan must also show that it took "reasonable measures to keep such information secret."  18 U.S.C. § 1839(3)(A).  Defendants claim that "ResMan failed to offer substantial evidence that it took 'reasonable measures' to protect the secrecy of any of [the eighteen specifically identified] features (or any other feature of the ResMan [P]latform)" (Dkt. #320 at p. 21).[5]

ResMan asserts that "[t]he [j]ury reasonably found that ResMan took reasonable measures to protect the secrecy of its trade secrets" (Dkt. #325 at p. 15).

---

[5] Defendants' secrecy and independent-value arguments derive from the primary contention that the entire ResMan Platform cannot be a trade secret as a matter of law.  Although the Court has rejected such argument, the Court still addresses the essential elements contained within the definition of a trade secret to ensure sufficient evidence exists to support the jury's verdict.

Regarding secrecy, the jury was instructed:

Although section (A) of this definition requires the trade secret owner to take reasonable precautions to maintain the secrecy of its trade secrets, secrecy need not be absolute.  Even where the holder of a trade secret voluntarily discloses the trade secret without the benefit of a confidentiality agreement, the requisite secrecy is retained if the disclosure occurs in a context that would not ordinarily occasion public exposure, and in a manner that does not carelessly exceed the imperatives of a beneficial transaction.  Limited disclosure of confidential information does not compromise the secrecy required for trade secret protection when the owner of the information discloses it to businesses with whom it was dealing or seeking to deal, rather than the public generally, and the disclosures were made to further the owner's economic interests

(Dkt. #286 at p. 18).  In accordance with both the jury instructions and the DTSA, the measures taken to maintain the Platform's secrecy must have only been reasonable under the circumstances. "Reasonable use of a trade secret including controlled disclosure to employees and licensees is consistent with the requirement of relative secrecy." *Reingold v. Swiftships, Inc.*, 126 F.3d 645, 650 (5th Cir. 1997) (analyzing the secrecy requirement under LUTSA, which is substantively similar to TUTSA and the DTSA).

The jury heard testimony from Olsen regarding measures ResMan takes to protect its confidential information and, by extension, its Platform's secrecy.  Specifically, the jury heard that ResMan's software is "in the cloud[,]" which means that "all of [ResMan's] data, both the source code, the actual instructions, as well [as] [ResMan's] client data is hosted in Microsoft Azure's Cloud architecture" (Dkt. #295 at p. 78).  Because ResMan utilizes Microsoft's cloud feature, the company "do[es not] have big servers or computers sitting in [its] office" (Dkt. #295 at p. 79). Instead, that responsibility has been "offloaded . . . to Microsoft[,]" and Microsoft is "constantly having to go through certifications, compliance, and . . . other things that require, from a government perspective, and—they do HIPAA certifications, all sorts of things, to make sure that their data centers are secure, as well as there is . . . biometric scans that have to happen in order to

10

access that" (Dkt. #295 at p. 79). The jury also heard Olsen testify that ResMan has its own firewall and two-factor authentication to ensure the Platform is protected (*see* Dkt. #295 at pp. 79–80), and that ResMan "ha[s] also had [Chief Technology Officers] and vice-presidents, other executives that their responsibility has been to ensure that the security of the platform is up to par" (Dkt. #295 at p. 81). Another important feature of ResMan's security is the Platform's requirement of a password to access the information (*see* Dkt. #293 at p. 91) ("[T]he ResMan Platform is user name and password-protected, so you can[not] get access to the [P]latform unless you are a customer").

Regarding protection from employees, Olsen testified that ResMan has an employee handbook, "which talks about IP, intellectual property, confidentiality agreements, and noncompete agreements that all [ResMan] employees sign" (Dkt. #295 at p. 74). The confidentiality requirement stems from ResMan's involvement in the software industry and the fact that "if a competitor were able to have [confidential] information, it could do [ResMan] harm—[ResMan] would lose a competitive advantage for that" (Dkt. #295 at p. 74).

ResMan also presented evidence about how it maintained secrecy from both potential and actual customers. Greg Demski, ResMan's senior vice president of business development, testified that demonstrations at a potential customer's office is regular, but "it[ is] a very guided and guarded experience" (Dkt. #298 at p. 31). ResMan "go[es] in with a scheduled agenda[,]" and ResMan "know[s] what [it] is showing to [the] prospective customers and what [the prospective customers] are looking at to find" (Dkt. #298 at p. 31). The demonstrations "typically last between 45 minutes and two hours" (Dkt. #298 at p. 32). Following a demonstration, potential customers "[g]et an idea of the look and feel of the [P]latform" by "[g]et[ting] an overview of some of the features and functionalities offered by the [P]latform" (Dkt. #298 at p. 32). However, a potential customer does not become an actual customer until ResMan completes an "onboarding process" and a Master

Subscription Agreement is signed (Dkt. #295 at pp. 77–78).  The MSA prohibits, among other things, the customers use of "any Confidential Information of [ResMan] for any purpose whatsoever except to the extent necessary in order to perform its obligations or exercise its rights under this Agreement"  (PX596 at § 7.2).  The MSA further prohibits a customer from providing credentials to third parties in order to create a competing product  (PX596 at § 3.6).  The jury had access to the MSA applicable to Defendants  (PX596).

Access to customers is not granted to the ResMan Platform until a Non-Disclosure Agreement ("NDA") is executed (*see* Dkt. #295 at p. 76); (*see also* PX33) (an email chain wherein a Karya executive informs ResMan that Karya "signed the NDA").  Olsen testified that the purpose behind the NDA is to ensure "that the only purpose of using [the limited access] that [a potential customer] [is] receiving is for  [the potential customer] to make [the] decision [whether to subscribe to ResMan]" (Dkt. #295 at p. 76).  According to Olsen, these potential customers, under the NDA, "can[not] use it for . . . any development process or to do anything that would compete with [ResMan]" (Dkt. #295 at p. 76).  Rather, the limited access is "simply for that decision of becoming a client" (Dkt. #295 at p. 76).  Once a customer is established, ResMan creates credentials that must be utilized to obtain access to the Platform (Dkt. #295 at p. 81).

Nicholas Khoury ("Khoury"), ResMan's former Director of Information Security and Compliance, and ResMan's expert, Dr. Kursh, also opined on the reasonableness of the security measures employed by ResMan.  Khoury ultimately offered the opinion that ResMan is a company "that took information security and compliance seriously" (Dkt. #302 at p. 41).  Dr. Kursh offered a comparable opinion: that "ResMan took reasonable measures consistent with software industry customs and practices to protect its confidential and proprietary information" (Dkt. #302 at pp. 102–03).  Dr. Kursh also detailed how he reached such an opinion (*see* Dkt. #302 at pp. 169–74).

While Defendants presented evidence that not every ResMan feature or function was subject to absolute secrecy, ResMan produced testimony and documents showing the measures taken were reasonable under the circumstances.  The jury weighed the evidence and reached a verdict.  Because, as noted above, the measures of secrecy must only be reasonable, and ResMan put forth evidence supporting such a finding, the Court declines to enter judgment as a matter of law on secrecy.

### iii.  Independent Value Derived from Secrecy

Next, Defendants assert that "there is no substantial evidence that 'the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information'" (Dkt. #320 at p. 24).[6]  According to Defendants, "this flaw afflicts every aspect of the ResMan [P]latform" (Dkt. #320 at p. 24).

ResMan responds that "[t]he [j]ury reasonably found that ResMan's confidential information derived independent economic value from not being generally known or readily ascertainable by proper means" (Dkt. #325 at p. 18).  ResMan offers four specific arguments in support of the jury verdict: (1) "Dr. Kursh—a renowned expert on property management software—testified that property management software is 'closed' . . . and that there are essentially no videos or books that discuss such systems with any granularity[;]" (2) "the years of effort and millions of dollars that ResMan expended to develop its Platform supports the fact that the Platform derives economic value from not being generally known or ascertainable by proper means[;]" (3) "Defendants concede that 'ResMan introduced evidence that the ResMan [P]latform has value in the marketplace[;]'" and (4) "the [j]ury heard evidence about the 'huge value' and

---

[6] The Court has rejected Defendants' challenge to ResMan's identification of trade secrets.  Thus, the Court will focus on Defendants' more generalized argument regarding independent economic value.

competitive advantage Defendants gained from their illegal use of the ResMan Platform to develop

Arya" (Dkt. #325 at pp. 19–21).

Regarding the independent value element, the jury was instructed that:

[T]he requirement that information is 'not generally known' and 'not readily
ascertainable through proper means' does not mean information is a trade secret
unless it is generally known to the public.  Information is readily ascertainable if it
is available in trade journals, reference books, or published materials.  Information
that is public knowledge or generally known in an industry cannot be a trade secret.
In addition, information that is generally known or readily available by independent
investigation is not a trade secret

(Dkt. #286 at p. 18).

ResMan points the Court to *Reingold v. Swiftships, Inc.*, wherein the Fifth Circuit analyzed

the propriety of a ship mold's trade secret status, and potential misappropriation by the defendant,

under LUTSA.  126 F.3d 654 (5th Cir. 1997).[7]  Under LUTSA, similar to the DTSA, the definition

of a trade secret requires such information to "derive[] independent economic value, actual or

potential, from not being generally known to and not being readily ascertainable by proper means

by other persons who can obtain economic value from its disclosure or use[.]"  LA. STAT. ANN.

§ 51:1431(4)(a).  In determining that the ship molds did, in fact, derive independent economic

value under LUTSA, the Fifth Circuit noted that "it had originally cost $1 million and had taken

nine months to construct the 90 foot ship mold."  *Reingold*, 126 F.3d at 650.  Further, the Fifth

Circuit noted that "[c]onsequently, it would have been extremely expensive and time consuming

for anyone to duplicate the mold through independent designing, planning, and construction or by

reverse engineering."  *Id*.  The Fifth Circuit also looked to the cost defendant paid for access to the

mold as an indicator of the independent economic value the mold possessed—"$145,000 per vessel

for using the mold in building two initial vessels, and $20,000 for its use in building each

---

[7] The Fifth Circuit's analysis was taken at the summary judgment stage; however, the reasoning is still relevant and
applicable to when a trade secret derives independent economic value.

subsequent vessel[.]" *Id.* According to the Fifth Circuit, the defendant's willingness to pay such amounts "cogently indicates that the mold derived independent economic value from not being generally known to and not being readily ascertainable by proper means by other persons." *Id.*

Based on the foregoing—and considering the similarities between the DTSA and LUTSA—the Court finds the Fifth Circuit's analysis in *Reingold* applicable to the present case. The jury heard testimony from Dr. Kursh that software programs, like ResMan, "take years to build" (Dkt. #302 at p. 175). Elizabeth Francisco ("Francisco"), ResMan's second founder, testified that creating ResMan came with "[l]ots of stops and lots of starts" (Dkt. #294 at p. 145). Francisco also testified that she and Olsen "did[ not] always get it right the first time, so there was a lot of going . . . different sessions of going back and forth through things and making edits and changes" which "went on for several years" (Dkt. #294 at pp. 144–45). The jury also heard that Francisco and Olsen "started to work together in 2008, and the first ResMan customer came in 2012" (Dkt. #294 at p. 153). In the summer of 2014, approximately 50,000 units were on the ResMan Platform (*see* Dkt. #294 at p. 153). Presently, approximately 650,000 exist on the Platform (*see* Dkt. #294 at p. 153). Further, ResMan spent over $11 million on salaries alone for ResMan employees during the development of the Platform (*see* Dkt. #295 at pp. 92–93). No dispute appears to exist, and the trial record certainly supports, that ResMan spent substantial time and money developing the Platform.

According to documents produced by ResMan, Karya agreed to pay a subscription fee for the use of the ResMan Platform at $3 per subscriber per month (PX44). Karya also agreed to pay both a one-time implementation fee for setup and installation, valued at $648.00 (PX44), and various recurring fees: $469.80 for per-unit software fees; $64.80 for the EasyLease Online Workflow; and $250.00 for access to the EasyLease Website, Deluxe Website Package (PX44).

The total recurring charges equaled $784.60 (PX44).  After both recurring and property charges and fees were totaled, Karya owed, and subsequently paid, ResMan $1,432.60 for access to the ResMan Platform (PX44).

ResMan also presented evidence outside of the time and cost it took Olsen and Francisco to develop the Platform.   Dr. Kursh testified that "the top-of-the-market [software] programs . . . are all . . . closed[,]" and "[t]he public "can[not] get into [ResMan's] software from outside" (Dkt. #302 at p. 92, 93).   According to Dr. Kursh, "[t]here are well over 600 property management companies that have independently decided to pay a monthly subscription fee for the use of ResMan with their properties[,]" and "[t]he value is clearly there" (Dkt. #302 at p. 176).   Further, Olsen testified that inappropriate use of ResMan would deplete ResMan's competitive advantage in the marketplace (*see* Dkt. #295 at p. 71)*; see also AHS Staffing*, 335 F. Supp. 2d at 864 (noting that the plaintiff's "competitive efforts would be severely hampered" if competitors, including defendant, were able to access and utilize plaintiff's confidential information).   Dr. Kursh testified that Defendants gained such advantage through the inappropriate use of ResMan in developing Arya, (*see* Dkt. #302 at pp. 114–18), and Olsen informed the jury that companies with inside information on ResMan would undoubtedly gain a "massive head start in building [their] own platform[s]" (Dkt. #295 at p. 72).

After considering both relevant law and the evidence presented at trial, the Court is persuaded that ResMan produced sufficient evidence to support the jury's finding of the existence of a trade secret.  Defendants have not shown how "the facts and inferences point so strongly and overwhelmingly in [their] favor that reasonable jurors could not reach a contrary conclusion." *Baisden*, 693 F.3d at 498.  Because Defendants did not make the requisite showing, the Court finds judgment as a matter of law on the existence of a trade secret inappropriate.

### b.  Misappropriation of Trade Secret

The jury instructions provided that a defendant misappropriates a trade secret if:

1. The person acquires the trade secret and knows or has reason to know the trade secret was acquired through improper means; or

2. The person uses or discloses the trade secret without the owner's express or implied permission when—

      a. The person acquired knowledge of the trade secret through improper means; or

      b. At the time the person uses or discloses the trade secret, the person knows or has reason to know that the person's knowledge of the trade secret was:

            i.  Derived from or through a person who used improper means to acquire the trade secret;

           ii.  Acquired under circumstances giving rise to the duty to maintain the secrecy of or limit the use of the trade secret; or

          iii.  Derived from or through a person who owed a duty to the person seeking relief to maintain the secrecy of or limit the use of the trade secret

(Dkt. #286 at pp. 19–20).

Defendants do not appear to contest that, assuming the Court finds ResMan owns one or more trade secrets, Defendants misappropriated such information.  The jury verdict is supported as to the second element of trade secret misappropriation.

### c.  Unjust Enrichment Damages

Regarding damages for trade secret misappropriation, the jury was instructed:

If you find that Defendants misappropriated any of ResMan's trade secrets, you must then determine the damages, if any, caused by Defendants' misappropriation of that trade secret.  ResMan seeks damages measured by Defendants' unjust enrichment, if any, caused by misappropriation

(Dkt. #286 at p. 20).  Specifically, as related to the definition of unjust enrichment, the Court instructed the jury:

> The law does not allow a person to profit by wrongdoing at the expense of another. 'Unjust enrichment' is an equitable principle holding that one who receives benefits unjustly should make restitution for those benefits. A party may be liable under a theory of unjust enrichment when it receives a benefit from another by means of an undue advantage. You may also hear this remedy referred to as 'disgorgement.' 'Disgorgement' is the act of giving up something that was unjustly obtained. If you find that Defendants benefitted from a trade secret belonging to ResMan, then you may award the monetary value that you attribute to those benefits as the measure of ResMan's damages. It may include any money that Defendants made by using ResMan's trade secrets. It may also include any costs that Defendants avoided by taking a 'shortcut' using ResMan's information

(Dkt. #286 at p. 21).

Defendants assert that "[u]nder the unique circumstances of this case, ResMan did not prove that any unjust enrichment was caused by Defendants' conduct" (Dkt. #320 at p. 26). According to Defendants, their "access to the ResMan [P]latform did not *cause* any 'head start' that would authorize damages for avoided development costs" (Dkt. #320 at p. 26) (emphasis in original). Further, Defendants argue that "[t]here is no substantial evidence of any unjust enrichment" (Dkt. #320 at p. 29).

ResMan responds that "[t]he [j]ury's unjust enrichment verdict is supported by substantial evidence" (Dkt. #325 at p. 28). Specifically, ResMan claims that: (1) "[t]he [j]ury awarded ResMan the value of the benefits of the trade secrets that ResMan proved Defendants had misappropriated[;]" (2) "[t]he [j]ury was entitled to reject Defendants' argument that they never realized any benefit from their misconduct[;]" and (3) "Defendants' 'net profits' theory is not the law" (Dkt. #325 at pp. 28, 30, 32).

### i. Court Intervention

Defendants maintained the position throughout trial that because the Court entered a preliminary injunction prohibiting further internal or commercial use of Arya, "it is undisputed that development ended long before Arya could be used" (Dkt. #320 at p. 27). Thus, according to

Defendants, "judicial intervention cut off the development of Arya long before Defendants could realize any 'significant head start' from their access to the ResMan [P]latform" (Dkt. #320 at p. 27).

ResMan argues that "[t]he [j]ury's rejection of Defendants' argument [that no head start was achieved] was eminently reasonable" (Dkt. #325 at p. 31). ResMan asserts that "[t]he [j]ury could reasonably conclude that neither Defendants' alleged voluntary cessation of access to ResMan nor the Court's preliminary injunction required Defendants to destroy Arya or otherwise surrender their ill-gotten gains[,]" and "[t]he evidence showed that Karya still possesses nearly a complete software platform created using ResMan" (Dkt. #325 at p. 31). ResMan claims "the [j]ury could reasonably conclude that Defendants did not, in fact, stop using ResMan's trade secrets at any point[,]" because "[t]he preliminary injunction manifestly did *not* prohibit development of Arya: Defendants objected to ResMan's request for such a prohibition, and the Court declined to include it" (Dkt. #325 at p. 31).

The Court agrees that this case presents an unusual question: Does the existence of a preliminary injunction sever the causal link between harm and damages in trade secret misappropriation cases? Despite Defendants' vehement argument that the issuance of the preliminary injunction "distinguishes the Fifth Circuit cases that have affirmed damage awards predicated on avoided development costs[,]" (Dkt. #320 at p. 27), the Court is ultimately persuaded that the answer to the question is no.

Defendants note that "[n]one of [the cases] involved a situation in which a court issued an injunction prior to completion of development"—essentially distinguishing their own case from those cited (Dkt. #320 at p. 27). Although Defendants are correct that "in every previous case where the Fifth Circuit has upheld an unjust enrichment award based on avoidance of development

costs, the defendant was able to achieve a 'head start[,]'" (Dkt. #320 at p. 28), Defendants have not provided the Court with any Fifth Circuit cases *rejecting* the proposition that development costs may be avoided even in the presence of a preliminary injunction.

ResMan, however, points the Court to *Epic Systems v. Tata Consultancy Services*—a Seventh Circuit case.  980 F.3d 1117 (7th Cir. 2020).  In *Epic Systems*, the Seventh Circuit "noted at least one way a plaintiff may prove the amount of benefit conferred on the defendant when the case involved misappropriation of trade secrets."  980 F.3d at 1130.  The Seventh Circuit referred back to a previous case where it had decided that although a trade secret "was not used directly to develop a new product and was not tied to any of the defendant's specific profits," the record in such previous case had "sufficient evidence that the defendants used the misappropriated operating procedures and manuals to gain 'a significant head start in their operation.'"  *Id.* (quoting *3M v. Pribyl*, 259 F.3d 587, 596, 607 (7th Cir. 2001)).  In *3M*, the Seventh Circuit "noted that damages were awarded based on 'what it would have cost the defendants to independently develop the trade secrets at issue.'"  *Id.* (quoting *3M*, 259 F.3d at 607).  Ultimately, the Seventh Circuit recognized that "avoided research and development costs have been awarded when the defendants gained a significant head start in their operations."  *Id.*

Similar to the plaintiff in *Epic Systems*, ResMan primarily sought damages based on avoided development costs.  Under Fifth Circuit law, "[t]he value of what the defendant has gained as a result of the misappropriation can be measured by a number of methods"—one of which being "damages measured by the costs saved by the defendants."  *Carbo Ceramics, Inc. v. Keefe*, 166 F. App'x 714, 723 (5th Cir. 2006) (citing *Univ. Computing Co. v. Lykes-Youngstown Corp.*, 504 F.2d 518, 538 (5th Cir. 1974)).  "This is typically shown through saved development costs."  *Id.* (citing *Bourns, Inc. v. Raychem Corp.*, 331 F.3d 704, 709–10 (9th Cir. 2003)).  "The costs a plaintiff spent

in development . . . can be a proxy for the costs that the defendant saved." *GlobeRanger Corp. v. Software AG United States of Am., Inc.*, 836 F.3d 477, 499 (5th Cir. 2016) (first citing *Carbo Ceramics*, 166 F. App'x at 723; and then citing *Univ. Computing Co.*, 504 F.2d at 538).

As a threshold matter, the preliminary injunction entered by the Court "[p]rohibit[ed] the Enjoined Karya Parties and the Enjoined Expedien Parties from taking any further action to use commercially or disseminate the Arya 1.0 platform and/or any other property management platform that such parties developed after obtaining access to the ResMan Platform" (Dkt. #44 at p. 2). In the Court's Order denying Defendants' Motion to Clarify or, in the Alternative, Modify the Preliminary Injunction, the Court instructed Defendants that "Karya may not use the Software on its own properties" (Dkt. #168 at p. 2). While the Court's preliminary injunction may have halted the *dissemination* and *use* of Arya, the injunction did not prohibit the *development* of the software. Because Defendants were free to continue developing Arya, and because Defendants had already completed a significant portion of the platform by the date the injunction was entered, the Court finds the injunction did not sever the causal link between ResMan's harm and its damages.

Judicial intervention may have prevented *further* harm from accruing due to Karya's inability to commercially use Arya; however, it did nothing to remedy the harm already suffered by ResMan. Allowing Defendants to utilize the preliminary injunction as a shield runs afoul of the elements ResMan had to prove to obtain the preliminary injunction:

> (1) a substantial likelihood of success on the merits, (2) *a substantial threat of irreparable injury if the injunction is not issued*, (3) that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted, and (4) that the grant of an injunction will not disserve the public interest.

*Concerned Women for Am. Inc. v. Lafayette Cnty.*, 883 F.2d 32, 34 (5th Cir. 1989) (citing *Clark v. Prichard*, 812 F.2d 991, 993 (5th Cir. 1987)) (emphasis added). Thus, through agreement or

otherwise, ResMan showed that a substantial threat of irreparable injury would result if the injunction was not issued.  Further, if the Court adopts Defendants' reasoning—that the injunction prohibited damages from accruing—the same could be said for all trade secret cases where an injunction is entered.  Such a result is absurd and ignores both the benefits conferred on Defendants *before* the injunction was entered and benefits existing outside commercial use of the trade secret. Because an injunction did not, as ResMan notes, "require [Defendants to] destroy[] the software program and [did] not order development stopped[,]" the Court agrees that such order did "not erase [the] head start" gained by Defendants (Dkt. #329 at p. 14).

ii. **Substantial Evidence**

Defendants next offer three reasons why "[t]here is no substantial evidence of any unjust enrichment[:]" (1) "[t]he DTSA and TUTSA do not permit an unjust enrichment recovery in the absence of net profits to the defendant[;]" (2) "[u]njust enrichment recovery cannot exceed the defendant's net gain, and there is no substantial evidence of any net gain in this case[;]" and (3) "[i]ndependently, there is no evidence of any 'net gain' to Expedien—and certainly none in excess of $162,500" (Dkt. #320 at pp. 29, 31, 35).

ResMan responds that "[t]he [j]ury was entitled to reject Defendants' argument that they never realized any benefit from their misconduct[,]" and "Defendants' 'net profits' theory is not the law" (Dkt. #325 at pp. 30, 32).

Regarding a net profits theory, Defendants "recognize that avoidance of development costs has been recognized, at common law, as one measure of unjust enrichment[,]" but then assert  "that measure is subject to the limiting factor of the defendant's net gain from use of the secrets" (Dkt. #320 at p. 29).  In support of this theory, Defendants point the Court to the Restatement (Third) of Restitution and Unjust Enrichment.  Further, Defendants utilize the comments to the Uniform

Trade Secrets Act ("UTSA")—after which the DTSA and TUTSA were modeled.  Defendants contend that the case cited in the official UTSA comments—*Tri-Tron International v. Velto*—illustrates that the "'two basic methods for assessing damages for misappropriation of trade secrets' are '(1) the damages sustained by the victim' and '(2) the *profits* earned by the wrongdoer by the use of the misappropriated material'" (Dkt. #320 at p. 30) (quoting 525 F.2d 432, 437 (9th Cir. 1975)) (emphasis in original).

However, as illustrated above, "[d]amages in misappropriation cases can take several forms: the value of plaintiff's lost profits . . . the defendant's actual profits from the use of the secret . . . the value that a reasonably prudent investor would have paid for the trade secret, costs the defendant avoided incurring through misappropriation . . . and a reasonable royalty." *Bohnsack v. Varco, L.P.*, 668 F.3d 262, 280 (5th Cir. 2012) (internal quotations and citations omitted).  "This variety of approaches demonstrates the 'flexible' approach used to calculate damages for claims of misappropriation of trade secrets."  *Id.* (citing *Univ. Computing*, 504 F.2d at 535).  Notably, "[w]here the secret has not been destroyed and where the plaintiff has not been able to show a specific injury, by analogy to patent law the appropriate measure of damages is not the loss to the plaintiff, 'but rather the benefits or profits, or advantages gained by the defendant in the use of the trade secret.'" *Ultraflo Corp. v. Pelican Tank Parts, Inc.*, 926 F. Supp. 2d 935, 962 (S.D. Tex. 2013) (quoting *Univ. Computing*, 504 F.2d at 536).

The UTSA cites *Tri-Tron International* for the proposition that "[a]s long as there is no double counting, Section 3(a) adopts the principle of the recent cases allowing recovery of both a complainant's actual losses and a misappropriator's unjust benefit that are caused by misappropriation."  National Conference of Commissioners on Uniform State Laws, *Uniform Trade Secrets Act With 1985 Amendments* 10 (1985).  That reference is much broader than the two

basic methods for assessing damages cited by Defendants.  Because the Fifth Circuit has taken a flexible approach to damages in a trade secret misappropriation claim, the Court finds that unjust enrichment is not limited to net profits.  As such, the Court will now determine whether substantial evidence was presented at trial to justify the jury's award of unjust enrichment.[8]

According to ResMan, the jury heard "substantial evidence that [ResMan's] unjust enrichment damages theories were not a feature-specific analysis, but rather all of the development costs that Karya avoided and development knowledge Defendants gained" (Dkt. #325 at pp. 28–29).  Regarding such head start, Olsen testified that "as a software developer, to be able to model something and understand and learn from a successful product already makes a massive difference, [and] would give you a massive head start in building your own platform" (Dkt. #295 at p. 72).  Specifically, "to see how [the program] flows and how it works . . . as a software developer, is actually more beneficial" than seeing a company's source code (Dkt. #295 at p. 72).  Further, according to Expedien's software development contractor John Greene, "it would have been a lot more time spent in development if [he] had to work with [ResMan and Realpage] and build the requirements [of a platform] from the ground up" (Dkt. #300 at p. 98).  Dr. Kursh, ResMan's expert on trade secrets, testified that Defendants "benefit[t]ed significantly from ResMan" (Dkt. #303 at p. 9).  Dr. Kursh testified that the "unjust enrichment" recognized by Defendants in this case "falls into two categories"—"[o]ne is the time savings" and the other is financially (Dkt. #303 at p. 9).

Dr. Kursh opined that Defendants "gained a minimum of seven to eight years of time" (Dkt. #303 at p. 9).  Dr. Kursh then told the jury how he reached that number—by looking at

---

[8] Defendants' remaining arguments regarding unjust enrichment are predicated on the Court's accepting the "net gains" argument.  The Court has not done so, and the remainder of the analysis on unjust enrichment therefore solely serves the purpose of determining if ResMan presented evidence sufficient to withstand a traditional Rule 50(b) challenge.

various software companies and determining how long those companies had been going through the "slow incremental process" of building a successful platform (Dkt. #303 at p. 9).  Looking outside the time that Defendants purportedly gained from observing ResMan, Dr. Kursh testified that "you can[not] develop this kind of software for [just over a million dollars]" (Dkt. #303 at p. 10).

Regarding Expedien, "ResMan presented evidence that Expedien was unjustly enriched by gaining invaluable software know-how and by winning the contract with Karya to develop the ResMan Platform" (Dkt. #325 at p. 30).  ResMan points to various exhibits showing that "[w]eeks before Expedien submitted its proposal for the Karya contract and two months before Karya and Expedien signed their software development contract, Karya first gave illegal access to the ResMan Platform to Expedien" (Dkt. #325 at p. 30) (citing PX57, PX59, PX61, PX63, PX76). Further, ResMan cites to Plaintiff's Exhibit 629 for the proposition that "Expedien used that access to log into ResMan repeatedly as it prepared its proposal to Karya" (Dkt. #325 at p. 30).  Further, Expedien's CEO Jiten Agarwal testified that "[he] wanted to get in to the password-protected ResMan Platform so that [he] could begin [his] work that would lead to [his] proposal to create Arya" (Dkt. #299 at p. 7).  Agarwal also testified that the contract between Karya and Expedien "was worth over $1.3 million to Expedien" (Dkt. #299 at p. 119) (*see also* DX75, DX216).

The jury was presented competent evidence that Defendants gained a benefit from accessing the ResMan Platform—for Karya, invaluable know-how and a head start developing a property management software; for Expedien, a contract with Karya valued at approximately $1.3 million.  Defendants continually argued that they did not, in fact, realize any benefit from the access to ResMan.  However, at most, the jury was presented with conflicting testimony—either of which the jury was entitled to believe.  Defendants fail to present, and the Court does not find,

25

evidence that "points so strongly and overwhelmingly in favor of one party that the court believes that reasonable jurors could not arrive at any contrary conclusion." *Dresser-Rand Co.*, 361 F.3d at 838.  Because Defendants did not make the requisite showing as to unjust enrichment, the Court finds judgment as a matter of law on ResMan's entitlement to trade secret misappropriation damages inappropriate.

### d.  Exemplary Damages

Defendants next offer two reasons why "ResMan is not entitled to any award of exemplary damages"—(1) "ResMan is not entitled to recover any actual damages for the reasons stated above, so it is not entitled to recover exemplary damages[;]" and (2) "the DTSA only allows exemplary damages 'if the trade secret is willfully and maliciously appropriated'" (Dkt. #320 at p. 37) (quoting 18 U.S.C. § 1836(b)(3)(C)).  According to Defendants, "[t]here is no evidence that Defendants acted either 'willfully' or 'maliciously' under the DTSA; there is no evidence that they specifically intended to violate ResMan's legal rights to do it harm" (Dkt. #320 at p. 37).

ResMan responds that "[t]he [j]ury reasonably awarded exemplary damages" (Dkt. #325 at p. 33).  ResMan notes that Defendants' argument does not set forth the appropriate legal standard that "the Court, without objection, gave the [j]ury" (Dkt. #325 at p. 34).

Regarding exemplary damages, the jury was instructed that:

> To award exemplary damages against a Defendant, you must find willful and malicious misappropriation by a preponderance of the evidence.  'Willful and malicious misappropriation' means intentional misappropriation resulting from the conscious disregard of the rights of the owner of the trade secret

(Dkt. #286 at pp. 21–22).

As a threshold matter, the Court has found ResMan is entitled to recover damages under 18 U.S.C. § 1836(b)(3)(B). [9]  Thus, Defendants' first argument is a nullity.  Regarding Defendants' second argument, regardless of whether the Court utilizes the new legal standard offered by Defendants or the legal standard given to the jury, the trial record certainly supports a finding of willful and malicious misappropriation.

When asked whether he "did[ not] want ResMan to know that Karya was developing its own software[,]" Jeffrey Gomez, a current employee of Karya, stated, "I would say [we] kept it close to the chest" (Dkt. #298 at pp. 88-89).  Exhibits offered also showed that Karya did not want ResMan to know that Arya was being developed.  *See* PX219, PX340, PX354, PX389.  Not only did Karya not want ResMan to know about Arya, but Jiten Agarwal testified that he "knew that when Karya launched the Arya software, its competitors would include ResMan and RealPage" (Dkt. #299 at p. 137).  Swapnil Agarwal, the CEO and founder of Karya, testified affirmatively that "Karya's plan for the Arya system [was] to use it for all the properties that Karya manages"— despite those properties having been on ResMan's Platform (Dkt. #300 at p. 158).  Further, Jiten Agarwal testified that he "did not ask whether [he] [was] authorized to have [the user IDs and passwords to ResMan]" when Karya provided the information in an attempt to have Expedien create a competing product (Dkt. #298 at p. 97).  Jiten Agarwal admitted that "[accessing] password-protected software without permission" was wrong and "unethical" (Dkt. #298 at pp. 98–99).  Jiten Agarwal also called this behavior "reckless" (Dkt. #298 at p. 106).  While Jiten

---

[9] The DTSA allows for the assessment of exemplary damages against a defendant "if the trade secret is willfully and maliciously misappropriated." 18 U.S.C. § 1836(b)(3)(C).  Exemplary damages are limited to "2 times the amount of the damages awarded under subparagraph (B)."  18 U.S.C. § 1836(b)(3)(C).  Unjust enrichment is an express measure of damages under subparagraph (B).  Thus, exemplary damages are available to ResMan under the statute's plain language.

Agarwal qualified his answers and attempted to distinguish this context from others, the jury was free to either believe or not believe his explanation.

ResMan further offered documentary evidence of willful and malicious misappropriation. For instance, ResMan offered Plaintiff's Exhibit 114—an email in which access to ResMan was given to Expedien by Karya with a warning to "please be careful" (PX114). Karya also provided Expedien credentials to Expedien developers. The information regarding the competing platforms, which was included in the email with the usernames and passwords, was "to understand their working while devising new requirements for the 'new' property management system" (PX299). PX629 shows that Expedien logged into the ResMan Platform at least 1,049 times (PX629). Swapnil Agarwal told software developers to "take lots and lots of screenshots of what [Karya] like[s][,]" and for the developers to "[t]ry to understand the architecture of how [ResMan] built it so [Karya] can learn the best parts, no point reinventing the whole thing" (PX38). Despite a formal letter from ResMan's outside legal counsel, (*see* PX377), Defendants continued using the ResMan Platform to develop Arya (*see* Dkt. #299 at p. 147); (*see also* PX380, PX591). Finally, ResMan points to Swapnil Agarwal's text message to Paul Bridgewater, wherein Swapnil Agarwal states he "will destroy [Bridgewater] and ResMan!!" (PX625).

Although Defendants introduced various explanations for *why* they misappropriated the ResMan Platform and what they *actually* intended while doing such misappropriation, the jury was free to discredit that testimony if it saw fit. The testimony and documents introduced by ResMan certainly would allow a jury to reasonably determine willful and malicious misappropriation. As such, ResMan has shown an entitlement to exemplary damages, and the jury verdict should remain unbothered.

## II.   Tortious Interference[10]

Defendants contend that "this . . . claim is displaced by the TUTSA, unjust enrichment is not a viable theory of recovery for tortious interference under Texas law, and there is no substantial evidence to support liability, damages, or exemplary damages" (Dkt. #320 at p. 37).  ResMan does not offer a counterargument in its response; however, in its reply, ResMan states that its "election to not recover for tortious interference does not entitle[] Defendants to JMOL on this claim" (Dkt. #329 at p. 18).

"So long as 'the election of remedies theory applies in this case, the issue of whether' the unelected award 'was proper is moot.'"  *Gil Ramirez Grp., L.L.C. v. Marshall*, 765 F. App'x 970, 974 (5th Cir. 2019) (quoting *Am. Rice, Inc. v. Producers Rice Mill, Inc.*, 518 F.3d 321, 341 (5th Cir. 2008)).  Because ResMan did not choose to recover on its tortious interference claim against Expedien, the Court need not decide whether such award is proper.

## CONCLUSION

It is therefore **ORDERED** that Defendants' Rule 50(b) Motion for Judgment as a Matter of Law (Dkt. #320) is hereby **DENIED**.

**SIGNED this 4th day of August, 2021.**

AMOS L. MAZZANT
UNITED STATES DISTRICT JUDGE

---

[10] While Defendants emphasize their entitlement to judgment as a matter of law on this claim in Dkt. #320, Defendants refer the Court to the briefing in Dkt. #277 to support their arguments.