# United States District Court

**EASTERN DISTRICT OF TEXAS**
**SHERMAN DIVISION**

| | | |
|---|---|---|
| RESMAN, LLC, | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| | § | CIVIL ACTION NO.  4:19-CV-00402 |
| v. | § | Judge Mazzant |
| | § | |
| KARYA PROPERTY MANAGEMENT, | § | |
| LLC, and SCARLET INFOTECH, INC., | § | |
| d/b/a EXPEDIEN, INC. | § | |
| | § | |
| *Defendants*. | § | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Pending before the Court are ResMan's Motion for Entry of Final Judgment and Permanent Injunction (Dkt. #313) and ResMan's Motion for Appointment of Independent Monitor (Dkt. #314).  Having considered the motions and the relevant pleadings, the Court finds that ResMan's motions should be granted in part and denied in part.

## BACKGROUND

This case involves the misuse by Karya Property Management, LLC ("Karya") and Scarlet InfoTech, Inc. d/b/a Expedien, Inc. ("Expedien") of ResMan Platform, a property management software owned by Plaintiff ResMan, LLC.  Specifically, ResMan alleges that Karya and Expedien (collectively, "Defendants") gave third parties access to the ResMan Platform (the "Platform"), aiding in the development of a competing software—Arya.  ResMan claims that Karya provided Expedien with extensive unauthorized access to ResMan's proprietary software platform for the express purposes of usurping and unfairly building upon ResMan's investments in its Platform.

ResMan's Platform provides property managers with tools designed to help manage virtually every aspect of their property management business.  ResMan claims its platform is confidential and proprietary.  Customers are only able to access the Platform after signing a Master Subscription Agreement ("MSA") that imposes both strict use restrictions and confidentiality obligations on the customer.  ResMan states that after signing the MSA, Karya provided three non-transferrable User IDs and passwords to the Platform to Expedien for the purpose of Expedien producing a competing software.

After a nine-day trial, the jury reached a verdict (Dkt. #287).  In its verdict, the jury found breach of contract against Karya, tortious interference with a contract against Expedien, and trade secret misappropriation against both Defendants.  The jury awarded: (1) $45,000.00 in lost profits damages arising from Karya's breach of contract; (2) $45,000.00 in lost profits damages arising from Expedien's tortious interference with a contract; (3) $11,400,000.00 in unjust enrichment damages arising from Expedien's tortious interference with a contract; (4) $30,000,000.00 in exemplary damages arising from Expedien's tortious interference with a contract; (5) $9,400,000.00 in unjust enrichment damages arising from Karya's misappropriation of ResMan's trade secrets; (6) $11,400,000.00 in unjust enrichment damages arising from Expedien's misappropriation of ResMan's trade secrets; (7) $40,000,000.00 in exemplary damages arising from Karya's misappropriation of ResMan's trade secrets; and (8) $50,000,000.00 in exemplary damages arising out of Expedien's misappropriation of ResMan's trade secrets.

On April 19, 2021, ResMan filed the present motions (Dkt. #313; Dkt. #314).  On May 19, 2021, Defendants filed a response (Dkt. #321).  On June 2, 2021, ResMan filed a reply (Dkt. #324).  On June 9, 2021, Defendants filed a sur-reply (Dkt. #328).

## LEGAL STANDARD

Federal Rule of Civil Procedure 58 governs the entry of final judgment.  While Rule 58(b)(1) details the circumstances under which the clerk of the court must enter judgment "without awaiting the court's direction," Rule 58(b)(2) outlines those circumstances under which the Court must approve final judgment before such can be entered by the clerk.  Specifically, Rule 58(b)(2) provides that:

> [T]he court must promptly approve the form of judgment, which the clerk must promptly enter, when:
>
> > **(A)** the jury returns a special verdict or a general verdict with answers to written questions; or
>
> > **(B)** the court grants other relief not described in this subdivision (b).

FED. R. CIV. P. 58(b)(2).

## ANALYSIS

ResMan seeks the entry of final judgment on the jury's findings of breach of contract and trade secret misappropriation.  Further, ResMan seeks the issuance of a permanent injunction and the appointment of an Independent Monitor "to facilitate Defendants' compliance with the Permanent Injunction" (Dkt. #314 at p. 1).

Defendants respond that "[f]or the reasons set forth in Defendants' Rule 50(b) motion, ResMan is not entitled to judgment on its trade secrets claim, but Defendants are not contesting its right to an appropriate judgment for breach of contract—which may include injunctive relief along with appropriate damages and reasonable and necessary attorneys' fees" (Dkt. #321 at p. 6). Regarding the appointment of an Independent Monitor, Defendants "agree to use Magistrate Judge Kimberly Priest Johnson, who has significant experience with trade secret cases" (Dkt. #321 at p. 18).

## I.    Final Judgment

In its motion for entry of final judgment, ResMan "elect[ed] to recover on its breach of contract claim against Karya and its trade secret misappropriation claims against both Defendants" (Dkt. #313 at p. 1).  Thus, ResMan asks the Court to enter liability findings in accordance with the jury's verdict—namely, that Karya breached the MSA; that Expedien tortiously interfered with MSA; and that both Defendants misappropriated ResMan's trade secrets.  ResMan further seeks monetary damages from Defendants.  As to Karya, ResMan seeks:

1.  $45,000.00 in lost profits for breach of contract;

2.  $9,400,000.00 in unjust enrichment damages for misappropriation of ResMan's trade secrets;

3.  Prejudgment interest on the foregoing amounts accruing at 5% annual simple interest beginning on June 3, 2019;

4.  $18,800,000.00 in exemplary damages for willful and malicious misappropriation of ResMan's trade secrets; and

5.  Postjudgment interest on the foregoing amounts as provided in 28 U.S.C. § 1961 accruing as of the date this judgment is signed until judgment is paid in full.

As to Expedien, ResMan seeks:

1.  $11,400,000.00 in unjust enrichment damages for misappropriation of ResMan's trade secrets;

2.  Prejudgment interest on the foregoing amount accruing at 5% annual simple interest beginning on June 3, 2019;

3.  $22,800,000.00 in exemplary damages for willful and malicious misappropriation of ResMan's trade secrets; and

4

4.  Postjudgment interest on the foregoing amounts as provided in 28 U.S.C. § 1961 accruing as of the date this judgment is signed until judgment is paid in full.

As to Defendants, jointly and severally, ResMan seeks:

1.  Costs of the action as determined pursuant to Federal Rule of Civil Procedure 54(d)(1) and Local Rule CV-54;

2.  ResMan's attorneys' fees and expenses in an amount to be determined by the Court; and

3.  Postjudgment interest on the foregoing amounts as provided in 28 U.S.C. § 1961 accruing as of the date this judgment is signed until judgment is paid in full.

ResMan also asks the Court to enter a permanent injunction related to the jury's finding of trade secret misappropriation.  Because Defendants contest aspects of both the monetary damages and permanent injunction, the Court will address ResMan's entitlement to each separately.

### a. Breach of Contract

As an initial matter, "Defendants are not contesting ResMan's breach of contract claim" (Dkt. #321 at p. 8).  As such, "Defendants do not oppose entry of judgment on that claim, an award of the lost profits found by the jury, injunctive relief tailored to the MSA, and reasonable attorneys' fees that were necessary to litigate the breach of contract claim (which will be determined by separate motion)" (Dkt. #321 at p. 8).

Because Defendants have conceded that ResMan is, in fact, entitled to the jury's finding of lost profits in the amount of $45,000.00, final judgment is appropriate as to ResMan's damages for Karya's breach of contract.

### b.  Liability for Trade Secret Misappropriation

Defendants broadly contest ResMan's right to judgment on its trade secret claim.  In support of this position, Defendants reference the arguments made in Defendants' Rule 50(b) Motion for Judgment as a Matter of Law (Dkt. #320).

For the same reasons outlined in the Court's Memorandum Opinion and Order denying Defendants' Motion, (Dkt. #339), the Court finds ResMan is, in fact, entitled to liability findings on its trade secret misappropriation claim.  Because ResMan is entitled to such a finding, the Court now determines the propriety of the monetary damages awarded by the jury and contested by Defendants.

### c.  Monetary Damages

Regarding monetary damages, Defendants first argue that ResMan is not entitled to any amount of monetary damages on its trade secret misappropriation claim.  Rather, Defendants contend the proper remedy to make ResMan whole is a permanent injunction.  However, if the Court does find monetary damages appropriate, Defendants offer two reasons why the jury's damages award on ResMan's trade secret misappropriation claim cannot stand: (1) the amount is too speculative, and (2) the separate awards against Karya and Expedien compensate for the same harm twice.

According to Defendants, "Expedien and Karya have been enjoined from utilizing any ResMan trade secrets since June 2019[,]" and "[t]he Court's preliminary injunction, which ResMan proposes to make permanent, has prevented Expedien and Karya from realizing any benefit from the misappropriation that the jury found" (Dkt. #321 at p. 9).  Defendants ultimately assert that issuing a permanent injunction and awarding compensatory damages to ResMan would constitute an impermissible double recovery.  Beyond the double-recovery argument, Defendants

6

argue that "ResMan's calculation of Defendants' supposed unjust enrichment is too speculative to support a damages award on its trade secrets claim[,]" and "[e]ven if ResMan were entitled to recover for unjust enrichment, its damages could not exceed $9,400,000.00" (Dkt. #321 at pp. 12, 13).

### i. Double Recovery

The Defend Trade Secrets Act, the trade secret misappropriation statute under which ResMan seeks to recover, provides for two civil remedies "[i]n a civil action brought . . . with respect to the misappropriation of a trade secret[:]" (1) the granting of an injunction, and (2) the awarding of monetary damages. 18 U.S.C. § 1836(b)(3).  Particularly relevant to the present case, a court may "award . . . damages for any unjust enrichment caused by the misappropriation of the trade secret that is not addressed in computing damages for actual loss."  *Id.* § 1836(b)(3)(B)(II). Of note, the DTSA does *not* include language indicating that one remedy may be picked only at the exclusion of the other; rather, the structure of the statute appears to allow for both methods of recover.  *See id.*  Such allowance is, of course, limited by the disallowance of double recovery. The Court is convinced that, under the facts of the present case, however, both methods may reasonably be utilized without impermissibly allowing ResMan to recover duplicative damages for Defendants' trade secret misappropriation.

In reaching its verdict on the trade secrets claim, the jury necessarily found that "[Defendants'] misappropriation caused damages to ResMan" (Dkt. #286 at p. 17).  Regarding those damages, the jury was instructed that the amount of ResMan's compensatory damages for trade secret misappropriation was appropriately measured by the amount attributable to Defendants' unjust enrichment (*see* Dkt. #286 at p. 20).  The jury was further instructed that "[t]he purpose of compensatory damages is to make ResMan whole—that is, to compensate ResMan for

the damage it *has* suffered" (Dkt. #286 at p. 10) (emphasis added).  Thus, the jury's award of $9,400,000.00 against Karya and $11,400,000.00 against Expedien served to compensate ResMan for its damages sustained in the past, not the harm reasonably likely to occur from future use of the trade secret.  An injunction—which Defendants claim is capable of curing all harm attributable to Defendants' misappropriation—does not go back in time and correct, or appropriately compensate for, the wrong.  Rather, an injunction prevents harm from occurring in the future.

Defendants anticipated ResMan would make a "distinct harm" argument: "ResMan may argue that courts sometimes award damages for past harm along with an injunction to prevent future harm—distinct and separate harms" (Dkt. #321 at p. 11).  In discounting ResMan's potential argument, Defendants claim that they "are not aware of any case in which a court has awarded damages for a harm that ultimately did not materialize because of an injunction" (Dkt. #321 at p. 11) (citing *Winston Rsch. Corp. v. Minn. Mining & Mfg. Co.*, 350 F.2d 134 (9th Cir. 1965)).  However, ResMan did prove that a harm materialized, despite the issuance of an injunction.  ResMan established at trial, and the jury credited, that Defendants' taking of ResMan's trade secrets harmed ResMan by giving Defendants a head start on Arya at the expense of ResMan's time and monetary investments (*see* Dkt. #339 at pp. 22–26).  The preliminary injunction did not require Defendants to either destroy ResMan or stop development on the Arya Platform; rather, Defendants simply could not commercially *use* Arya—internally or externally (*see* Dkt. #44; *see also* Dkt. #168 at p. 2).  Thus, Defendants' argument that harm never materialized due to the Court's injunction does not comport with either the evidence presented at trial by ResMan or the jury verdict rendered in accordance with the Court's instructions (*see* Dkt. #339 at pp. 18–26).

Defendants ultimately renew the primary argument advanced in their Rule 50(b) Motion— that the Court's issuance of a preliminary injunction severed any causal link that might have

existed between Defendants' misappropriation of ResMan's trade secrets and any harm subsequently occurring to ResMan (*see* Dkt. #320 at p. 27).  For the same reasons outlined in the Court's Memorandum Opinion and Order on Defendants' Rule 50(b) Motion, (*see* Dkt. #339 at pp. 18–22), the Court finds this argument unpersuasive.  The jury found that the misappropriation of ResMan's trade secrets *caused* harm to ResMan.  The jury was not responsible for determining whether ResMan will be harmed in the future—that decision was left to the Court.  Because ResMan's monetary damages address a past harm and any permanent injunction issued by the Court would address future harm, the Court is convinced that no double recovery would occur by allowing both measures of damages to stand.

### ii.  Speculative Damages

According to Defendants, "the only appropriate remedy on ResMan's trade secrets claim is a permanent injunction" (Dkt. #321 at p. 12).  Defendants claim that, "[a]s explained more fully in [the] Rule 50(b) Motion, the only proof ResMan offered to establish avoided development costs was speculative and conclusory, based entirely on the *ipse dixit* of Dr. [Stephen] Kursh" (Dkt. #321 at p. 12) (citing Dkt. #320 at p. 34).

Contrary to Defendants' assertion, Nick Olsen ("Olsen"), ResMan's founder and CEO, and Dr. Kursh testified as to development costs incurred by ResMan and, therefore, necessarily avoided by Defendants.  Olsen testified that ResMan spent over $11 million on employee salaries alone during the development of the Platform (*see* Dkt. #295 at pp. 92–93).  Dr. Kursh testified that he "recogniz[ed] the amount of time and effort" used in developing the Platform, and he "took the 13 million-dollar number [testified to by ResMan executives and shown through documentary evidence as the cost of developing the entire Platform] and . . . gave it what [they] call in the industry a haircut of 25 percent" (Dkt. #303 at p. 17).  Dr. Kursh did not merely discuss the

"haircut" given and move on, however.  Dr. Kursh noted that "[the haircut] also picked up on the fact that ResMan, like all software development companies, makes mistakes along the way, blind alleys as [he] . . . call[ed] them . . . and [he] cut the 13-plus million by 25 percent" (Dkt. #303 at p. 17).

Insofar as Defendants contend that Dr. Kursh's testimony was inadmissible, such challenge was made and ruled upon by the Court pre-trial.  Thus, the jury was presented with a trade secrets expert who offered a competent opinion and subsequently explained how that conclusion was reached. Dr. Kursh further testified that Karya could not, in his opinion, have developed the Arya Platform for $1.3 million—the cost of the invoices sent by Expedien (*see* Dkt. #303 at pp. 17–18). In fact, "[a]ll [Dr. Kursh was] looking at [were] the gains that the [D]efendants got here with respect to financial and time savings" (Dkt. #303 at p. 17).

ResMan did not rest its development costs on Olsen and Dr. Kursh alone, however. ResMan also presented the jury with documentary evidence of its development costs (*see* PX677). PX677 presented, via a table, certain development costs dating from January 2013 to December 2015  (*see* PX677).  The total of these costs, which were explained in a column titled "description," equaled $1,518,172.00  (PX677).  ResMan next provided the jury with a second table detailing product management and development costs from June 1, 2016, to July 31, 2019  (*see* PX644B). Thus, over this three-year time span, ResMan spent $11,078,201.00  (PX644B).

After considering the foregoing, the damages presented by ResMan were not merely speculative.  "While 'damages may not be determined by mere speculation or guess, it will be enough if the evidence show[s] the extent of the damages as a matter of just and reasonable inference, although the result be only approximate.'"  *DSC Comms. Corp. v. Next Level Comms.*, 107 F.3d 322, 330 (5th Cir. 1997) (quoting *Terrell v. Household Goods Carries' Bureau*, 494 F.2d

16, 24 (5th Cir. 1974)).  While the amount Dr. Kursh testified Defendants saved in development costs may not equal the exact amount down to the dollar, Dr. Kursh based his testimony on both his experience in the industry and the amount of time and money ResMan used when creating its Platform. The jury, when considering Dr. Kursh's testimony alongside the cost charts provided by ResMan, chose to believe Dr. Kursh's estimation of damages.  As further evidenced in the Court's Order on Defendants' Rule 50(b) Motion, there was sufficient testimony and documentary evidence presented to support a verdict.

### iii.   Damages in Excess of $9,400,000.00

Defendants also argue that "[s]etting aside the duplication between ResMan's proposed injunction and damages award, ResMan's proposed judgment seeks double damages for development costs that, under its theory, Defendants saved only once" (Dkt. #321 at p. 13). Defendants specifically claim that "[t]he only evidence of unjust enrichment that ResMan offered was ResMan's own development costs, which ResMan used as a proxy for the costs Karya avoided in developing Arya" (Dkt. #321 at p. 13).

ResMan responds that it "proved at trial, and the [j]ury found, that each Defendant was unjustly enriched in different ways and in different amounts" (Dkt. #324 at p. 9).  ResMan contends that "Karya, a property management company, paid only $650,000.00 to illegally obtain property management software functionality that took ResMan approximately 10 years and more than $10 million to develop" (Dkt. #324 at p. 9).   ResMan also claims that "Expedien, a software development company, misappropriated the fruits of ResMan's years of development and significant capital investment—and not only paid nothing for it, but received a contract worth $1.3 million using that illicit knowledge" (Dkt. #324 at p. 9).

Regarding unjust enrichment, the jury was instructed that "if [it] find[s] that Defendants benefitted from a trade secret belonging to ResMan, then [it] may award the monetary value that [it] attribute[s] to those benefits as the measure of ResMan's damages" (Dkt. #286 at p. 21).[1]

Generally, unjust enrichment is an equitable remedy. *See Tex. Advanced Optoelectronic Sols., Inc. v. Renesas Elecs. Am., Inc.*, 895 F.3d 1304, 1322–26 (Fed. Cir. 2018) (differentiating between legal and equitable remedies and determining that unjust enrichment for trade secret misappropriation is equitable). Thus, the Court ordinarily determines whether unjust enrichment is appropriate and, if so, the appropriate amount to be disgorged. *See id.* at 1326 (concluding that the plaintiff "ha[d] no right to a jury decision on its request for disgorgement of [defendant's] profits as a remedy for trade secret misappropriation"). In accordance with the general rule, on July 9, 2021, the Court invited the parties to submit proposed findings of fact and conclusions of law (Dkt. #333). On July 16, 2021, ResMan submitted ResMan's Objection to the Court's July 9 Order, and in the Alternative, Proposed Findings of Fact and Conclusions of Law Regarding Unjust Enrichment Damages (Dkt. #334). ResMan's objection invokes Federal Rule of Civil Procedure 39 to support the contention that the unjust enrichment award found by the jury is not advisory and is rather binding upon the Court.

Rule 39(c) provides that an equitable remedy—such as unjust enrichment—may be tried by the jury upon consent of the parties. *See* FED. R. CIV. P. 39(c) ("In all actions not triable of right by a jury the court upon motion or of its own initiative may try and issue with an advisory jury or . . . the court, with consent of both parties, may order a trial with a jury whose verdict has the same effect as if trial by jury had been a matter of right."). "[O]nce litigants have consented—

---

[1] The jury was further instructed that unjust enrichment "may also . . . [be] referred to as 'disgorgement'" (Dkt. #286 at p. 21). The definitions of unjust enrichment and disgorgement are the same: "[T]he act of giving something up that was unjustly obtained" (Dkt. #286 at p. 21).

either expressly or impliedly—to a nonadvisory jury, the court must provide them advance notice if it intends to regard the verdict as advisory." *Alcatel USA, Inc. v. DGI Technologies, Inc.*, 166 F.3d 772, 795–76 (5th Cir. 1999) (first citing *Thompson v. Parks*, 963 F.2d 885, 888 (6th Cir. 1992); and then citing *Bereda v. Pickering Creek Indus. Park, Inc.*, 865 F.2d 49, 52 (3d Cir. 1989)). "Accordingly, 'whether or not the issues were equitable in nature, the verdict of the jury must be treated as if the right had existed and it is beyond the power of the district court to set the verdict aside on the theory it was advisory.'" *Id.* at 796 (quoting *Thompson*, 963 F.2d at 888).[2]

In the present case, ResMan demanded a jury trial "of all issues" (Dkt. #60 at p. 26). ResMan did not include any language limiting such jury demand, such as "of all issues triable by jury" or "of all issues to which a right to jury is established." Rather, ResMan sought a jury finding on *all* issues—legal and equitable. Defendants did not object, nor did Defendants move to strike the jury demand. In fact, Defendants admitted "ResMan has demanded a trial by jury" (Dkt. #88 at p. 15). Though Defendants objected to the form of the jury instructions on unjust enrichment, they did not voice opposition to the substance or the submission of such instructions. The parties therefore consented to trying unjust enrichment to the jury, and the Court did not indicate prior to trial that the unjust enrichment damages would be advisory. *See Gloria*, 51 F.3d 1045 (quoting *Thompson*, 963 F.2d at 889, with approval). As such, the jury's finding of unjust enrichment

---

[2] On July 22, 2021, Defendants filed a Response to ResMan's Objections to the Court's July 9 Order (Dkt. #337). In the response, Defendants contend that Rule 39, and the Fifth Circuit precedent cited by ResMan, merely *allow* the Court to treat the jury verdict as binding—not mandate such. However, the Fifth Circuit has noted it "could not agree more" that "'[t]he parties are entitled to know prior to trial whether the jury or the court will be the trier of fact[,]'" and "Rule 39(c) operate[d] to create a binding jury" when the defendant "consent[ed] to a jury trial, [the court] deni[ed] [defendant's] motion to strike the jury demand, and the district court[] [did] not alert[] the parties, prior to trial, that the jury would be advisory." *Gloria v. Valley Grain Products, Inc.*, 51 F.3d 1045, *3 (5th Cir. 1995) (unpublished) (quoting *Thompson*, 963 F.2d at 889). In accordance with Fifth Circuit Rule 47.5.3, *Gloria* is precedent, despite its unpublished status. The Court therefore finds Defendants' contrary contention inapposite. Regardless, the Court finds good reason to treat the jury verdict as binding, whether discretionary or otherwise.

damages, and the amount found, are binding upon the Court, subject to Rule 50's reasonable jury standard.

ResMan sufficiently established that Defendants misappropriated its trade secrets (*see* Dkt #339 at pp. 4–17). For such misappropriation, ResMan sought unjust enrichment of Defendants' ill–gotten gains—a remedy expressly allowed under the DTSA. *See* 18 U.S.C. § 1836(b)(3)(B)(ii) (A court may award "damages for any unjust enrichment caused by the misappropriation of the trade secret that is not addressed in computing damages for actual loss."). Because ResMan sufficiently established each element of its trade secret misappropriation claim, and unjust enrichment is a remedy provided for in the DTSA, the Court finds ResMan is entitled to receive unjust enrichment damages from Defendants. Because ResMan is entitled to unjust enrichment damages, the Court must now determine the appropriate amount.

ResMan asserts that the jury's verdict should stand. As noted above, the jury assessed $9,400,000.00 in unjust enrichment damages against Karya and $11,400,000.00 against Expedien (*see* Dkt. #287 at p. 6). Defendants disagree, stating that "[e]ven if ResMan were entitled to recover for unjust enrichment, its damages could not exceed $9,400,000[.00]" (Dkt. #321 at p. 13). Regarding the proposed $9,400,000.00 ceiling, Defendants contend that the Court may only award that amount once, assessing such damages jointly and severally.

Defendants are separate tortfeasors. Although Defendants worked together to create one platform, each Defendant misappropriated ResMan's trade secrets, and benefitted from such misappropriation, in individualized ways. While the end product, Arya, was the goal of both Defendants' misappropriation, such goal does not necessarily transpose into the same benefits conferred onto Defendants by their misappropriation. The Court will therefore address each Defendant individually.

The Court agrees with ResMan that Karya benefitted by receiving "property management software functionality" at much less time and expense than if Karya had not given Expedien access to the ResMan Platform (*see* Dkt. #324 at p. 9).  Dr. Kursh testified that Karya "gained a minimum of seven to eight years of time" by utilizing the ResMan Platform (Dkt. #303 at p. 9).  Dr. Kursh also opined that Karya saved 75% of the $13,386,913.17 ResMan spent when developing its own platform—totaling $10,040,184.88 (*see* Dkt. #303 at p. 17). Under applicable precedent, as noted above, ResMan's development costs are a proper proxy by which the Court may measure Karya's unjust enrichment.  *See Bohnsack v. Varco, L.P.*, 668 F.3d 262, 280 (5th Cir. 2012) ("Damages in misappropriation cases can take several forms[,]" including: "the development costs the defendant avoided incurring through misappropriation." (internal citations omitted)).  Because avoided development costs are a permissible measure of damages for trade secret misappropriation, and because ResMan put forth sufficient evidence establishing the amount of such avoided development costs, (*see* Dkt. #339 at pp. 22–26), the Court finds the jury's verdict of $9,400,000.00 appropriate to assess against Karya for its trade secret misappropriation.[3]

Expedien did not receive the same benefit of a new platform.  Rather, Expedien benefitted by way of gaining software know-how and "a contract worth $1.3 million" (*see* Dkt. #324 at p. 9).  While Expedien may not have a new platform, the jury heard sufficient evidence that Expedien saved development costs, just as Karya did.  Expedien actually created the software and, in turn, was who actually avoided paying its developers for time and energy spent creating Arya.  Dr. Kursh's testimony accounts for Defendan*ts*' avoided development costs—not Karya's exclusively (*see* Dkt. #339 at pp. 24–25).  The inclusion of Expedien in Dr. Kursh's opinion makes sense— Expedien was the company *actually developing* the platform.  The costs saved during development

---

[3] Dr. Kursh opined that Defendants saved $10,040,184.88 in development costs.  The Court speculates that the jury reached $9,400,000.00 against Karya due to Karya's undisputed  payment of $650,000.00 to Expedien.

of Arya fell first to Expedien, the company tasked with actual completion of the software, and then shifted to Karya, the company responsible for—at least partially—funding Expedien's venture. Defendants have not cited to, and the Court has not found, any contradictory testimony or documentary evidence showing that Expedien somehow did not benefit from its use of ResMan by way of avoiding costs. Rather, Defendants contend that ResMan cannot recover the same development costs by both Defendants, an argument the Court has already rejected above. Ultimately, Expedien both saved substantial money during the creation of Arya and gained invaluable software know-how by utilizing ResMan—two benefits the Court finds are properly measured by ResMan's development costs.

ResMan further presented evidence regarding the contract entered into between Expedien and Karya for the development of Arya. ResMan produced documents and testimony showing that Expedien garnered a contract with Karya worth approximately $1,318,128.00 after utilizing ResMan's confidential information (*see* Dkt. #299 at pp. 118–19); (*see also* DX75; DX216). Taking the value of the contract, coupled with Defendants' $10,040,184.88 in avoided development costs,[4] the Court finds substantial evidence in the record to support the jury's award of $11,400,000.00 in unjust enrichment damages against Expedien.

In accordance with the foregoing, ResMan is entitled to receive $9,400,000.00 for Karya's misappropriation of trade secrets and $11,400,000.00 for Expedien's misappropriation of trade secrets.

## II.    Permanent Injunction

As an initial matter, Defendants do not dispute that ResMan is entitled to a permanent injunction. Rather, Defendants contend that "ResMan's proposed injunction is overbroad, vague,

---

[4] The Court again notes that Dr. Kursh testified that ResMan's avoided development costs were $10,040,184.88, despite the $9,400,000.00 assessed by the jury against Karya.

and not narrowly tailored to remedy the wrongful acts found by the jury" (Dkt. #321 at p. 15). Specifically, Defendants assert that: (1) "[t]he proposed injunction is overbroad because it prohibits legally permissible conduct by Karya and Expedien[;]" (2) "[t]he proposed injunction is vague and procedurally deficient because it purports to bind individuals and entities who are not before the Court[;]" and (3) "[t]he independent monitor is sufficient to ensure compliance without banning Defendants from an entire software field" (Dkt. #321 at pp. 16–18).

ResMan responds that it "tailored the Proposed Permanent Injunction to prevent future harm to ResMan from Defendants' misconduct" (Dkt. #324 at p. 11).  According to ResMan, "[t]he development cooldown period that [it] proposes protects against Defendants' inevitable use of ResMan's confidential information" (Dkt. #324 at p. 11).  Further, ResMan claims that "[t]he Court should reject Defendants' efforts to create a gaping loophole in the permanent injunction by redefining the term 'Arya[,]'" and "ResMan has accommodated as far as possible Defendants' other proposed changes in its Revised Proposed Permanent Injunction" (Dkt. #324 at p. 13).

Regarding ResMan's Revised Proposed Permanent Injunction (the "Revised Proposal"), Defendants assert that it "remains overbroad" for three reasons: (1) "ResMan's definition of 'Arya' would encompass any property management software that Karya or Expedien might later develop, regardless of whether that software contained any ResMan confidential information[;]" (2) "ResMan has included provisions that require Karya and Expedien to pay its attorney's fees if ResMan files a motion to enforce the injunction[;]" and (3) "the absolute ban on Karya and Expedien developing property management software is unnecessary and excessive" (Dkt. #328 at pp. 10–11).

"When crafting an injunction, district courts are guided by the Supreme Court's instruction that 'the scope of injunctive relief is dictated by the extent of the violation established.'" *ODonnell*

*v. Harris Cnty.*, 892 F.3d 147, 163 (5th Cir. 2018) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979)).  When issuing an injunction, the Court "must narrowly tailor [the] injunction to remedy the specific action which gives rise to the order." *John Doe #1 v. Veneman*, 380 F.3d 807, 818 (5th Cir. 2004).  "The broadness of an injunction refers to the range of proscribed activity . . . [and] is a matter of substantive law." *U.S. Steel Corp. v. United Mine Workers of Am.*, 519 F.2d 1236, 1246 n.19 (5th Cir. 1975).

### i.  Definition of Arya

ResMan's Revised Proposal defines Arya as "any property management software designed or developed, in whole or in part, by the Enjoined Parties, or either of them" (Dkt. #324, Exhibit 1 at p. 3).  Defendants suggest "Arya" should be defined more narrowly: specifically, "the property management software called 'Arya'" (Dkt. #321, Exhibit 2 at p. 3).

The Court sees deficiencies in both proposals.  ResMan's definition, on one hand, prohibits Defendants from utilizing *any* software designed or developed by Karya or Expedien—whether such software includes ResMan DNA or not.  On the other hand, Defendants' proposed definition allows for either the usage of Arya under a different name or the takings of functionalities from Arya in the development of a new software platform.

The "specific action which gives rise to the order," *John Doe #1*, 380 F.3d at 818, is Defendants' misappropriation of ResMan's trade secrets.  Thus, to remedy such an action, Defendants undoubtedly must be restricted from using both the present Arya system and the functionalities and features contained therein that resulted from Defendants' misappropriation of the ResMan Platform.  However, the injunction must still be narrowly tailored "by the extent of the violation established." *ODonnell*, 892 F.3d at 163.  As such, the Court will not restrict Defendants from creating a software platform wholly unrelated to and untainted by ResMan's

18

trade secrets following the expiration of any applicable "cool down" period provided for in the permanent injunction.

After considering the foregoing, the Court finds the following definition of Arya appropriate: "Arya" means both the substantive property management software platform called "Arya," and the functions and features contained within the platform called "Arya." Further, the Court finds it prudent to include in the definition of "Arya" that Defendants may not circumvent the restrictions set forth in the permanent injunction by changing the name of the platform or creating a new platform by duplicating the functions and features contained within the platform called "Arya."  Such limitations on the definition of "Arya" will ensure that the injunction does not unduly limit Defendants' right to create property management software.   However, the definition of "Arya" is broad enough to ensure that ResMan's trade secrets will be protected from further misappropriation and usage.

### ii.  Attorneys' Fees Provision

Next, Defendants argue that ResMan's attorneys' fee provisions—which provide that Defendants will "be liable for all expert witness and attorneys' fees, costs, and expenses incurred to enforce this Permanent Injunction, including all costs, attorneys' and expert witness fees, and expenses of ResMan" (Dkt. #324, Exhibit 1 at p. 8)—"improperly shift [the] financial burden to Karya and Expedien even if ResMan loses [the applicable motion to enforce the injunction]" (Dkt. #328 at p. 10).   According to Defendants, "[s]uch a fee-shifting order would be unfair and unlawful—and it would wrongly incentivize ResMan to file motions against Karya and Expedien even when those motions are without merit" (Dkt. #328 at p. 10).

ResMan includes various sections detailing Defendants' obligation to pay attorneys' fees. Sections 4(d), 5(c), 8(d), and 9(b) provide that ResMan is entitled to attorneys' fees following: (1)

some non-filing of a required document and (2) ResMan's filing of a motion to show cause. Because ResMan cannot seek attorneys' fees absent Defendants not complying with various requirements of the permanent injunction, no hesitation exists that ResMan would likely prevail on the merits of such motion. As such, the recovery of attorneys' fees in such instances is certainly reasonable—Defendants cannot simply choose to not comply with the permanent injunction. The expenses incurred through the filing of a show cause motion would be the direct result of Defendants' objective noncompliance. As such, the Court does not find the attorneys' fees clause in the abovementioned sections overbroad.

The Court reaches the same conclusion regarding the language in the final section of the permanent injunction. The final section provides that "Defendants shall be liable for all expert witness and attorneys' fees, costs, and expenses *incurred to enforce this Permanent Injunction*, including all costs, attorneys' and expert witness fees, and expenses of ResMan" (Dkt. #324, Exhibit 1 at p. 8) (emphasis added). Inherent in the language is that ResMan succeeds on any legal action commenced due to Defendants' lack of compliance with the permanent injunction. If the Court finds against ResMan, there is nothing to enforce—Defendants have presumably complied with the permanent injunction. Thus, absent success on any motion to enforce the permanent injunction, in whatever form such motion takes, ResMan will not be entitled to any fees or costs. Because Defendants' concerns are satisfied through the express language of and implicit meaning behind the already-included clause, the Court finds modification unnecessary.

### iii.   Absolute Ban on Software Development

Defendants' last challenge to ResMan's Revised Proposal stems from the alleged absolute ban on Defendants' ability to develop software. According to Defendants, "the absolute ban on Karya and Expedien developing property management software is unnecessary and excessive"

because "[t]he independent monitor will ensure that if either Defendant undertakes such a project, it will do so without using any confidential information of ResMan" (Dkt. #328 at p. 11).

ResMan argues that "[i]t is impossible to delete from the minds of Defendants' employees either the technical data or the valuable business 'insights' Defendants obtained" (Dkt. #324 at p. 11).

Section 7 of ResMan's Revised Proposal governs the Development of Arya or Other Property Management Software (Dkt. #324, Exhibit 1 at p. 6).  Section 7(a) prohibits Karya, or its enjoined entities, from "developing any property management software, including but not limited to Arya, for a period of twenty-four (24) months from the Effective Date" (Dkt. #324, Exhibit 1 at p. 6).  Section 7(c) prohibits the Expedien parties from "developing any property management software for a period of seventy-two (72) months from the Effective Date" (Dkt. #324, Exhibit 1 at p. 6).

Considering the facts of the present case, the ban on Karya's development of a property management software is reasonable and narrowly tailored to ensure no further misappropriation of ResMan's trade secrets occurs.  Prohibiting such development for twenty-four months does not, as Defendants assert, "exclude lawful competition" (Dkt. #321 at p. 18).  Competition is lawful only if *no* trade secret of ResMan is utilized in a software development program.  Competition is no longer lawful if ResMan DNA is transported from Arya into a newly created software program. Notably, Karya still has a (albeit incomplete) version of Arya.  Further, as noted by ResMan, "Karya's top executives were actively engaged in the development of Arya" (Dkt. #324 at p. 11). The Court agrees that "[e]ven with a rigorous monitoring program, it would be implausible for Karya to resume development of property management software without the involvement of the company's top executives" (Dkt. #324 at p. 12).  Thus, a twenty-four month "cool down" period

is appropriate to ensure any risk to ResMan's trade secrets is mitigated, while bearing in mind Karya's right to lawfully compete within the property management realm.[5]

Regarding Expedien, the Court finds forty-eight months of nondevelopment sufficient. Although the Court acknowledges that "Expedien . . . presents especially acute concerns regarding (mis)use of knowledge gained while unlawfully accessing the ResMan [P]latform[,]" the proposed seventy-two months is excessive.  In support of such a long prohibition, ResMan contends that "[g]iven the sheer scale of Expedien's illegal access and CEO Jiten Agarwal's admission that it is impossible to know which of Expedien's dozens of employees accessed ResMan's system over the course of thousands of logins persisting for more than a year, it would be of questionable utility to prohibit Expedien from assigning personnel involved with Arya to any property management software development" (Dkt. #324 at p. 12).  ResMan also asserts that "[a] longer cool-down period for Expedien thus makes sense: any development of property management software by Expedien would inevitably further exploit ResMan's confidential information" (Dkt. #324 at p. 12).  However, ResMan does not justify the total length of time it proposes.

Compelling reasons certainly exist to impose a longer prohibition on Expedien.  However, absent any reason as to why such ban should be *three* times longer than Karya's, the Court finds the number excessive.  Rather, a forty-eight-month development ban will sufficiently ensure the continued propriety of ResMan's trade secrets.  In continued compliance with Fifth Circuit precedent requiring a permanent injunction be narrowly tailored "by the extent of the violation established[,]"  *ODonnell*, 892 F.3d at 163, the Court finds a shortening of ResMan's proposed development ban on Expedien proper.

---

[5] The twenty-four months proposed by ResMan, in addition to the twenty-four months since the preliminary injunction was issued, provides ResMan with approximately a four-year head start period.  Such time is reasonable, seeing as testimony introduced at trial provided that ResMan spent over ten years developing its Platform (*see* Dkt. #339 at p. 15).

## III.    Independent Monitor

In ResMan's Motion for Appointment of Independent Monitor (Dkt. #314), ResMan proposes four individuals that it "submits . . . are qualified to serve as the Independent Monitor under the terms of ResMan's Proposed Permanent Injunction" (Dkt. #314 at p. 2).  Defendants agree to the appointment of Magistrate Judge Kimberly C. Priest Johnson—one of the individuals submitted by ResMan (*see* Dkt. #321 at p. 18).  As such, the Court finds Judge Johnson should be, and hereby is, appointed as the Independent Monitor tasked with ensuring Defendants' compliance with the Permanent Injunction.

## CONCLUSION

It is therefore **ORDERED** that ResMan's Motion for Entry of Final Judgment and Permanent Injunction (Dkt. #313) and ResMan's Motion for Appointment of Independent Monitor (Dkt. #314) are hereby **GRANTED in part** and **DENIED in part** as set forth herein.

It is further **ORDERED** that Magistrate Judge Kimberly C. Priest Johnson is hereby appointed as the Independent Monitor in this case.

**IT IS SO ORDERED**.

 **SIGNED this 5th day of August, 2021.**

AMOS L. MAZZANT
UNITED STATES DISTRICT JUDGE

23